[Crim. No. 4452.   Third Dist.   Nov. 24, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. SHIRLEY YVONNE PEDERCINE, Defendant and Appellant.

Paul Petrozzi, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Daniel J. Kremer and James T. McNally, Deputy Attorneys General, for Plaintiff and Respondent.

PIERCE, P. J.—The appeal is from a judgment following a conviction for two counts of violation of Business and Professions Code, section 4390[1] (passing fictitious prescriptions).

There are three contentions: (1) Unlawful search and seizure; (2) spurious methods by the police in the use of photographs to bolster testimonial identification of defendant; and (3) insufficient evidence to support the verdict. Contention (1) is insubstantial. Contention (2) is correct, but we will explain why prejudicial error does not always flow from the police practice complained of and why it did not here. Contention (3) is not only frivolous, in addition, proof of guilt by evidence unquestionably admissible was so firmly established we must say there was no miscarriage of justice. (Cal. Const., art. VI, § 13.) To establish the latter point we discuss the evidence in some detail.

On September 16, 1966, defendant first visited Kenneth Johnson, a Sacramento physician. She called as a patient with a weight problem. She gave her name as Mrs. Yvonne Marvich. After examination the doctor prescribed Preludin, a drug described by Dr. Johnson as one which curbs appetite. It is also regarded, and the tablets are sometimes used as "pep pills." Taken in excessive doses, i.e., 9 or 10 a day for 5 to 6 days, it is a very dangerous drug, causing respiratory failure and extreme excitation. The doctor wrote a prescription for 100, 25-milligram tablets, one to be taken 30 minutes before each meal. Defendant who testified in her own behalf admitted this incident.

A day or two later, according to Dr. Johnson's testimony, defendant telephoned the doctor. She said a cleaning woman

---

[1] "Every person who signs the name of another, or of a fictitious person, or falsely makes, alters, forges, utters, publishes, passes, or attempts to pass, as genuine, any prescription for any drugs is guilty of a forgery and upon conviction thereof shall be punished by imprisonment in the state prison for not less than 1 year nor more than 14 years, or by imprisonment in the county jail for not more than 1 year.

"Every person who has in his possession any drugs secured by such forged prescription shall be punished by imprisonment in the state prison for not less than one year nor more than six years, or by imprisonment in the county jail for not more than one year."

had mistakenly disposed of the unfilled prescription. She asked the doctor to replace it by phoning a pharmacy. He did so. Defendant in her testimony denied this conversation.

On September 21, 1966, defendant visited Dr. Johnson's office again; this time she did not call as a patient. She accompanied a Mrs. Pearl Ortega and the latter's daughter. The daughter was being treated for a dog bite. Defendant went into a treatment room with the Ortegas. There was a prescription pad in the treatment room. Each prescription sheet bore the doctor's printed name, address, telephone number and United States registry number at the top. The pad was accessible to defendant (or to Mrs. Ortega) while the doctor treated the child. (Defendant testified she saw Mrs. Ortega take the pad. Mrs. Ortega, a prosecution witness, denied she had done so; she denied ever using "pep pills." No evidence contradicted this.)

Dr. Johnson described defendant. On both visits she wore trousers and a shirt, wore her hair short with a masculine-type cut. This fits her facial description in photographs, profile and front views, taken by the police after defendant's arrest. Dr. Johnson, a prosecution witness, identified defendant positively at the trial. He also described Mrs. Ortega. Her description does not fit that of defendant. Mrs. Ortega, having been a prosecution witness as stated, was, of course, seen by the jury.[2]

We reach the incident which comprises the first count of the information. On the morning of September 22, 1966, a woman tried to obtain Preludin at Zarett's Pharmacy in Sacramento. She presented a prescription to a clerk, Emma Harrington. The prescription (in evidence) was written on a prescription blank identified by Dr. Johnson as being one of his. It was made out to "Bobbie Jones." It prescribed "25 Mg #100 one 30 min before each meal." It was signed "Kenneth M. Johnson." It was a forgery. (The forged prescription, however, called for the same dosages of the same number of tablets of the same drug of the same strength as the valid prescription defendant had admittedly obtained from the doctor for her own use.) The clerk presented the

---

[2]We have not seen defendant. We have, however, seen two "blown-up" police photographs of her (full face and profile) admittedly properly in evidence. (People's Exhibits 3 and 4.) The photographs were taken immediately following defendant's arrest for the offenses here involved. Facial features are distinctive. Assuming, as we must, that the photograph is an accurate likeness of defendant, a jury reasonably could have believed that a person who had once seen defendant would be extremely unlikely to be mistaken in a later identification.

prescription to Dr. Philip Lee, the pharmacist. First, however, she asked the woman for her address. Initially the woman told her it was 12*29* 29th *Street*. Then she corrected the address to 12*20* 29th Street. In her own handwriting Miss Harrington wrote both the first given and corrected addresses on the prescription form. Defendant actually lived at 2728 29th Avenue. When the slip was presented to the pharmacist, he, being familiar with Dr. Johnson's handwriting, suspected the prescription was a forgery. During the delay for identification, the woman departed, stating she had to get to work. Miss Harrington, a prosecution witness, made a courtroom identification of defendant as the woman who had presented the prescription. She also described her as she had appeared when she presented the prescription. She said she was a person whom at first could have been taken for either a "boy or girl," with very short hair combed straight back, with a voice that was deep and could have been either male or female. She was wearing dark blue trousers and a sweater. She was shown the photograph profile described above (see footnote 2) and again identified defendant—stating, however, that the hair arrangement (in the photograph) was unlike that during the drug store visit. Then it had been combed straight back and was slicked down. (We will discuss the identification further below.)

Defendant, under circumstances to be related hereinafter, was questioned by the authorities. She gave a statement. In it she admitted having presented the prescription at Zarett's Pharmacy. At the trial she admitted she had been a previous customer at that store (which is at least 2 miles from her home) ; she denied, however, the incident described.

When the woman identified as defendant left the store, Miss Harrington, the clerk, noted her departure; this at the request of Dr. Lee, the pharmacist. She saw her depart in a white car and took down the license number. She noted it as A*V*V-722. (The car which defendant drove was actually a white Buick. Its correct license number is A*A*V-722.) Miss Harrington observed no one else in the car with defendant nor did anyone join defendant at the car. Defendant denied ever driving the white Buick (which, however, was in her garage when she was arrested), saying it would have been a parole violation for her to do so. She said the car belonged to Bernice Hulbert who lived with her. Miss Hulbert, a prosecution witness. confirmed she was "supposed to be" the owner of the Buick but stated that defendant drove it.

On the evening of September 25, 1966, there was a repeat performance of attempted prescription passing at another pharmacy. (That incident is the basis of the second count.) Appellant and her roommate, Bernice Hulbert, entered the Tower Drug, and one of them, using one of Dr. Johnson's prescription blanks, offered another forged prescription. That one (in evidence) was purportedly for "Pearl Carter" and called for the same quantity of Preludin as had the former one. The pharmacist, Dr. Edwin Goman, a prosecution witness at the trial, positively identified defendant as one of the two women. He could not recall whether it was she or Miss Hulbert who had handed the prescription to him, although he believed it was defendant. He was sure, however, it was defendant who conversed with him and said the prescription was for a friend. Defendant admitted she had been at Tower Drug but said it was Miss Hulbert who had tried to fill the prescription and added the latter was doing this for Pearl Ortega. She said she had not seen the face of the prescription. The pharmacist questioned the authenticity of the prescription. He kept it, however, and the women left.

Dr. Goman called the authorities. A narcotics agent, Shierloh, called at the store. The incident was described and the prescription was handed to the officer.

On September 29, 1966, at 5:40 p.m., defendant was arrested at her home. Officer Shierloh made the arrest. He had an arrest warrant. He was accompanied by Officer Nugent from the police department and Officer Ryan from the Division of Investigation of the state Department of Professional and Vocational Standards. Meager evidence as to the manner in which the officers gained entry was offered by the prosecution. None was offered by the defense. Officer Shierloh testified that defendant answered the door. He also stated a full warning—one satisfying all of the standards fixed by *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]—preceded any questioning. A search disclosed an empty vial in an electrical switch box affixed to the outside of the house. The label showed it was filled by Payless Drug Store, that it was issued to "Bobby Jones" by a Dr. VanDenBerg. The drug was specified as "Somoxadrine," an amphetamine, a "pep pill." Defendant admitted having obtained and filled *that* prescription. She explained the use of the name "Bobby Jones" as a name she adopted because she was a parolee and did not want to use her true name.

Defendant was interrogated at the Narcotics Bureau office.

Dr. Goman, in addition to his testimonial identification of defendant, identified her outside Tower Drug when she was seated in a police automobile. Although the record is not entirely clear, this was probably at the time of her arrest.

At the narcotics bureau office defendant and Miss Hulbert were questioned separately. As stated, defendant admitted both visits to Dr. Johnson's office and the incident at Zarett's Pharmacy. She sought to place blame on Mrs. Ortega for the theft of the prescription blanks and upon Miss Hulbert for the incident at Tower Drug. At her request she was allowed to speak to Miss Hulbert. Defendant, having first told Miss Hulbert to tell the truth, then suggested, or led, the latter in all of the answers given. As the conversation is described by Officer Shierloh, Miss Hulbert repeated just what defendant told her to say. (Miss Hulbert was called as a prosecution witness. She testified her statements had been untruthful. She confirmed Officer Shierloh's testimony indicating Miss Hulbert's subverted will. She gave as her reason that she was afraid of defendant who had at one time broken her nose and three toes with a hammer. At the house which the two shared, they occupied the same bed.)

### THE SEARCH AND SEIZURE

There was a discrepancy in Officer Shierloh's testimony relating to the entry of defendant's house. He testified at the outset that defendant had admitted him to the home. He had then arrested her and given her the required warning. Later in his testimony he said that when he had first observed defendant she was emerging from the bedroom into the front room wearing a sweater and panties and pulling on a pair of trousers. The contention is made for the first time on appeal that the entry must have been illegal under Penal Code, section 844, under *Mapp* v. *Ohio,* 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933], and under *People* v. *Cahan,* 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513]. We cannot jump to the conclusion that an entry was made without knocking or omitting the other Penal Code, section 844 requirements. Shierloh could have been more explicit, and his evidence is conflicting as to who opened the door. Perhaps it was Miss Hulbert who let the officers in; perhaps it was she and not defendant who walked from the bedroom to the front room scantily clothed. Nowhere in any of the testimony (including defendant's) is it stated that the entry was forcible or that defendant was in anyway surprised. The action

was vigorously defended. No objection was made at the trial.
■ A search of premises may be made so long as the search is incident to the arrest and the premises are at the time under the immediate control of the person arrested. (*People* v. *Dixon*, 46 Cal.2d 456, 459 [296 P.2d 557].) If we were to assume that the officers forced their way in, we would be assuming a fact not in evidence.

■ We hold it is fairly inferable from the testimony that the entry was without force. Failure to object at the trial dims our view of the contention that the fact that defendant was taken unawares in underwear had anything to do with a forcible entry. (*People* v. *Talbot* (1966) 64 Cal.2d 691, 701 [51 Cal.Rptr. 417, 414 P.2d 633].)

### IDENTIFICATION BY PHOTOGRAPHS

Defendant was identified at the trial by Miss Harrington and Dr. Goman; also by Dr. Johnson. The first of those witnesses to be called was Dr. Johnson. In addition to his courtroom identification, Dr. Johnson was shown by the prosecutor two large photographs of defendant (People's Exhibits 3 and 4; see footnote 2). There was no impropriety either in the introduction of those two photographs or in having them identified by Dr. Johnson. He knew defendant as Yvonne Marvich, she was well known to him; the pictures were taken at or about the time defendant was arrested. Identification of the photographs by the doctor was merely proof that the patient known to him as Yvonne Marvich was defendant as defendant appeared at the time of her visits and not necessarily as she had dressed herself for her appearance at the trial.

Similarly, Miss Harrington was shown People's Exhibit 3. (This was after the witness' in-court identification and after her description of defendant as the latter had appeared on her visit to Zarett's Pharmacy.) After examining the photograph the witness replied to the prosecutor: "That looks like her only her hair was combed straight back . . . and slicked down."

No objection was, or is now, made to the courtroom identification made using Exhibits 3 and 4 as described. Nor could there be. Miss Harrington's identification using the same photograph previously shown to Dr. Johnson was most convincing proof that the person known to the doctor as Yvonne Marvich and at least inferentially representing herself to be "Bobbie Jones" was the same person, to wit, defendant.

■ Evidence of an extrajudicial identification is admissible both to corroborate courtroom identification and as independent evidence of identity. (*People* v. *Gould* (1960) 54 Cal.2d 621, 626 [7 Cal.Rptr. 273, 354 P.2d 865]; *People* v. *Slobodion* (1948) 31 Cal.2d 555, 560 [191 P.2d 1]; *People* v. *Lockhart* (1962) 200 Cal.App.2d 862, 868 [19 Cal.Rptr. 719].) (In both *Gould* and *Lockhart* identification was made from a photograph.)

It was on cross-examination of Miss Harrington that defense counsel for the first time brought to light the photographs that are the subject of contention on appeal. These are defendant's Exhibits A through G, seven photographs, one of which (Exhibit C) is a police "mug shot" of defendant taken in 1954. The photographs were shown to Miss Harrington and she replied affirmatively to a question they had been brought out to Zarett's Pharmacy by an officer to see if the witness could identify defendant's likeness among the pictures shown. She had identified defendant correctly as being the subject of Exhibit C.

Officer Shierloh testified *on cross-examination* he had used the same seven photographs to seek an identification of defendant by Dr. Goman at Tower Drug.

We have examined the seven photographs. The picture of defendant (Exhibit C) shows a mannish person with short cut hair. Taken in 1954 it is obviously a 12-years-earlier likeness of defendant. The picture is so masculine in appearance it would be difficult to tell to which sex the subject of the photograph belongs. (The same may be said of Exhibits 3 and 4; see footnote 2.) On the other hand, the women in the other photographs (A, B, D and G) are by contrast six of the most feminine females possible to be found. The pictures include blondes whose hair styles might have been used for a "stay-curl" hair spray advertisement and a brunette wearing what we are told is a snood.[3]

We must believe that the selection of photographs was purposeful. No *real* selection was offered. The set of photographs exhibited to the witnesses was obviously "rigged." Had an offer in evidence of the *fact* of extrajudicial identification via the use of these photographs been initiated by the prosecution, we would have no hesitancy in pronouncing receipt of the identification made thereon into evidence error. We state that notwithstanding the rule that usually objections to an offer of

---

[3]See one pictured on page 2157 of Webster's Third New International Dictionary Unabridged.

extrajudicial identification via similar evidence have been held properly overruled as going to weight rather than admissibility. (See *People* v. *Diaz* (1967) 66 Cal.2d 801, 804-805 [58 Cal.Rptr. 729, 427 P.2d 505]; *People* v. *Parham* (1963) 60 Cal.2d 378, 380 [33 Cal.Rptr. 497, 384 P.2d 1001].) But in the cases cited (which involved police lineups) the court was concerned with situations where the question of bona fides was a fact question and therefore one for the trier of fact to decide. Here we consider the lack of bona fides to be so apparent that a court must say that reasonable minds cannot differ. This was a deliberate pervicacious practice calculated to nail down an identification later to be used in court. ▄ Because reasonable minds cannot differ on this we must condemn the practice as a matter of law. (3 Witkin (1954) Cal. Procedure, p. 2251.) The court in *People* v. *Gould, supra,* 54 Cal.2d 621, points out on page 626: '' [T]he earlier identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind.'' That, of course, is true. And therefore where the earlier identification is contrived, the argument posited boomerangs. Manifest unfairness pervades and poisons the whole process of identification. The United States Supreme Court recently in two cases (*United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed. 2d 1149, 87 S.Ct. 1926], and *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]) has held that a postindictment pretrial lineup at which the accused is exhibited to identifying witnesses without notice to and in the absence of accused counsel denies (through the 14th Amend.) the accused's Sixth Amendment right to counsel. The rationale of the newly announced rule seems to us to be unfairness and unreliability to an extent violative of due process. The same rationale prompts our declaration of a rule that a *prein*dictment pretrial identification conducted with obvious unfairness possesses the same unreliability and must be similarly condemned.

But here it was not the prosecution which brought the condemned method of obtaining the identification into evidence; it was defendant herself. The prosecution is to be commended that it shunned taking advantage of the officers' improperly obtained evidence. We cannot say, however, that that completely cured the evil. The jury was concerned with the ultimate verity of identification. The circumstances here put

defense counsel on the horns of a dilemma. Either he allowed the courtroom identification (plus the admittedly proper identification through People's Exhibits 3 and 4—see footnote 2) to go unchallenged or he himself was driven to put the inadmissible evidence before the jury to demonstrate its spurious nature.

### THE QUESTION OF PREJUDICE

A defendant should not be thus tactically disadvantaged. In a close case we would be required to face the question: Does the misuse of the process of identification just described constitute prejudicial error? We do not have to pass upon that question on this appeal. Here there was no prejudicial error. In an earlier draft of this opinion we essayed to summarize the facts from which we have drawn the conclusion beyond a reasonable doubt that the jury must have convicted defendant notwithstanding the condemned practice described and without considering the courtroom identification attributable to this practice. We found ourselves simply repeating the statement of facts given above. It is unnecessary to indulge ourselves in redundancy. Error, if any, was harmless. Justice has not miscarried.

Judgment is affirmed.

Friedman, J., and Regan, J., concurred.

A petition for a rehearing was denied December 20, 1967, and appellant's petition for a hearing by the Supreme Court was denied January 17, 1968.