[Crim. No. 13359.   Second Dist., Div. Five.   July 26, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. GEORGE TAYLOR PADGITT, Defendant and Appellant.

444

Paul P. Selvin and Marshall L. Barth, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Wiliam E. James, Assistant Attorney General, and David S. Sperber, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, P. J.—A jury convicted defendant on three counts of kidnaping for the purpose of robbery. (Pen. Code, § 209.) The jury also found that each victim suffered bodily injury. On the penalty phase of the case the jury fixed the penalty at life imprisonment without possibility of parole. On motion for new trial the court struck the findings of bodily harm and sentenced defendant to three concurrent terms in the state prison. He appeals.

### FACTS

*Count I:* At about 12:50 a.m. the victim, Mrs. V., was walking along 57th Street near Broadway. She was on her way to audition as a nightclub singer. A yellow Cadillac pulled up alongside the curb. The driver, the defendant, forced her at gun point to enter the car. He then blindfolded and gagged her. He drove for about five minutes and led her into a house. He made her kneel on the floor and lean on what she thought was a bed. He tied her hands behind her back. He took off her underclothes and had sexual intercourse. He also committed an act of sodomy.

After the victim was dressed she was led outside. Defendant drove away. In the vicinity of 64th Street he took off her blindfold, untied her hands and pushed her out of the car. He also returned her purse to her. Later she noticed that about $32 were missing.

Mrs. V. reported the matter to the police that night. Sometime thereafter she attended a lineup but her assailant was not in it.

Between February 27 and the date of defendant's preliminary hearing on June 20 the witness left town. On June 20 she returned. Police came to her house with "four or five, maybe more" mug shots. They showed a "lot of different people." She picked out defendant's picture because she "remember[ed] him very well." After she had picked out defendant's picture she was subpoenaed. No one suggested to her that she pick defendant's picture.

*Count II:* Carol W. was on Broadway between Slauson and 59th Street at 11:45 p.m. on May 27, 1966. A yellow Cadillac, driven by defendant, pulled up. Since Carol was a prostitute she asked defendant whether he was looking for a date. He was. They agreed on a price of $15. Carol directed him to drive to 54th and Main where defendant pulled out a knife and "put it around" her throat.

Defendant blindfolded her. He drove off.

Then there followed an episode in a bedroom, remarkably similar to the one with Mrs. V. except that the intercourse was only rectal and Carol was aware of the fact that she was being robbed when her money—$30—was taken, since she carried it in her brassiere. She was released near 59th Street and Main. On June 3 Carol saw defendant on the street and caused him to be arrested. She next saw defendant in a lineup.

In view of the nature of the issues raised on this appeal, Carol's testimony concerning the lineup is set forth *in toto* below.[1]

---

[1]*Direct Examination:* "Q When after this incident did you see the defendant? A At the Police Building in a lineup. Q Were there other people in the lineup? A Yes, there were. Q About how many? A There were about four or five men, I'm not sure. Q Can you give us any notion as to your degree of certainty that this is the man that did this to you? A I would never forget him. I picked him out of four men that I had seen. I was sure it was him."

*Cross-examination:* "You said you picked the defendant out of a lineup? A Yes. Q Were there other persons in the lineup at that time? A Yes, there were. Q You saw this man in the lineup? A Yes. Q Did he appear to have a lawyer there or anything of that nature? A I don't know. No, not that I know of. . . . Q Did you go to more than

Defendant moved to strike the testimony concerning the lineup identification on the ground that defendant was not represented by counsel and not informed of his right to have counsel present. The motion was denied.

*Count III:* Shirley W. was also a prostitute. She was walking her beat at 9 :30 p.m. on May 28, 1966. She made contact with defendant in much the same way as Carol. On the way to a motel defendant pulled a gun and blindfolded her. He forced her to have sexual intercourse with him on the front seat of the car. At that time Shirley no longer thought that he was a customer, because before defendant pulled the gun he had reached into her brassiere and taken $20. This made her aware of the situation she was in because ''he was supposed to be paying me and I wasn't supposed to be giving him any money.''

After the sexual act defendant drove back to where he had picked up his victim, took off the blindfold and let her out. Cross-examination of Shirley brought out the fact that she had identified defendant in the same lineup in which Carol had seen him. Again we quote her entire testimony.[2]

The defense was an alibi and character testimony from four witnesses.

one lineup? A No, I only went to one. Q Did the police call you and tell you to come to this lineup? A They came and got me. Q They told you they had the man in custody? A Yes. Q They told you to come down and pick him out? A Yes. Q As a matter of fact, they pointed him out to you and told you this is the man that did it, isn't that right? A No, they didn't. Q You kind of cooperated with them, isn't that right? A What do you mean cooperate? Q Whatever you call it. A I picked him out, if that's what you mean.''

[2] ''Q Where were you when you identified Mr. Padgitt? A I think it was the Glass House, if I'm not mistaken. Q You didn't see him on the street with the police before that time? A No. Q When you went to the Glass House, is this a lineup? A It was a little small room. Q Was he in that room by himself? A No. Q Who else was in the room? A Some more men. Q Had the police shown you a picture of Mr. Padgitt before you went down there? A No. Did they tell you that you were going down there to identify a man with hair standing up on his head, with a mustache? A No, they didn't. We was going to identify the man. They didn't describe him to us. Q You say us, was there more than you, more than one? A Me and Carol. Q You and Carol went together? A Yes. Q Did you and Carol look at this man at the same time? A Yes. Q Did you and Carol come to the conclusion that George Taylor Padgitt was the man at the same time? A We didn't have to come to the conclusion. We already knew when we seen him. Q That is without seeing any of the other people you knew this? A Yes. Q Did you look at the other people? A Yes, but we knew him right off. Q Both of you said, 'That's the man'? A Yes. Q How many other persons were in this lineup or in this room? A I don't know. Q Did anybody look like Mr. Padgitt? A No. Q Did anybody in there have a mustache? A I don't know. All I know is I recognized him. I wasn't trying to recognize

## Points Raised

The points raised on appeal are as follows: 1. Counts II and III must be reversed because defendant was denied the right of counsel at the lineup. 2. The lineup procedure denied defendant due process within the meaning of *Stovall* v. *Denno*, 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967]. 3. The photographic identification procedure pursued with Mrs. V. was unfair because at that time defendant had already been charged. 4. In view of the similarity of criminal method the error with respect to Counts II and III infected the jury in relation to Count I.

## Presence of Counsel

█ Defendant's opening brief was filed just before the opinion in *People* v. *Feggans*, 67 Cal.2d 444, 448 [62 Cal. Rptr. 419, 432 P.2d 21] was published in the advance sheets. *Feggans*, of course, held that in California the right to counsel at lineups, declared in *United States* v. *Wade*, 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926] and *Gilbert* v. *California*, 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], only applied to lineups after the date of those decisions. (*Stovall* v. *Denno*, *supra*.) Thereafter counsel addressed a letter to this court, drawing our attention to *Feggans*. He recognizes that *Feggans* is dispositive of his first argument, but points to the fact that with respect to another issue involved in *Feggans* the court said that ''counsel serves both the court and his client by advocating changes in the law if argument can be made supporting change.'' This court is, of course, bound by *Feggans*. All we can say is that the point is preserved if the Supreme Court wishes to change its mind.

Defendant does point out one possible distinction between *Feggans* and the case at bar. In *Feggans* there appears to have been no objection to the lineup testimony while here there was; but in view of the reasons given for not making *Wade* and *Gilbert* retroactive—fair warning to law enforcement authorities—it seems immaterial whether or not there is a trial court assertion of a right to counsel.

---

nobody else. Q So you didn't look at the rest of the people? A No. Q So you don't know whether anyone else resembled Mr. Padgitt or not? A I told you I wasn't looking at the rest of the men. I was there to identify him and nobody else. Q Did anybody point out and say, 'That's the fellow who owns the Cadillac'? A I don't know, I know we both identified him. I don't remember nobody pointing out, saying, 'That's the man with the Cadillac.' or not. Q Didn't you have a discussion with the officers before you went down there? A We went to identify the car, too, yes. Q What did you identify first, the car or the man? A I think it was the man, then the car.''

UNFAIR LINEUPS

■ Preliminarily it must be observed that in view of the nature of the defense—alibi—the motive to break down the lineup testimony was every bit as strong at the time of this trial—October 1966—as it would have been had it been the law that unfairness leads to exclusion of testimony. (*People* v. *Blackburn*, 260 Cal.App.2d 35, 44 [66 Cal.Rptr. 845].) This is not, therefore, a case where lack of prescience of *Stovall* v. *Denno, supra,* prevented a full airing of the problem.

Defendant points to the fact that each victim was blindfolded and remained thus until her release. Further it is pointed out that in view of the nature of defendant's crimes there is "a particular hazard that a victim's understandable outrage may excite vengeful or spiteful motives." (*United States* v. *Wade, supra,* p. 230 [18 L.Ed.2d at p. 1159].) That is all perfectly true, but each victim had ample opportunity to observe defendant before she was blindfolded and the "outrage" argument surely goes to weight, not to basic fairness.

Complaint is made of the fact that the two victims, Carol and Shirley, who appeared to be friends, attended the lineup together. To be sure, this created a situation which bristled with possibilities for unfairness, but none was shown. While the credibility of Carol and Shirley was more or less successfully attacked in various ways and their denials of any improprieties at the lineup may be subject to doubt, prevarication concerning events at the lineup is precisely one of the things against which the presence of counsel is designed to guard and we must presume that the Supreme Court had this in mind when it refused to give *Wade* and *Gilbert* retroactive application.

Finally, defendant refers us to the fact that as admitted prostitutes Shirley and Carol were peculiarly susceptible to police pressures. Neither girl had reported the incident spontaneously, but each apparently did so because she happened to be at a police station for routine investigation. It is suggested by defendant that the girls made the report to gain their freedom and then were under an obligation to identify someone. The record, however, does not really bear out the suggestion that the girls were in custody. In any event, we think that this point too goes only to weight.

THE MUG SHOT IDENTIFICATION

■ For some reason, not clear from the record, defendant was charged with the kidnaping of Mrs. V. before she had ever identified him. He claims that she was under particular

pressure because the police got in touch with her on the day of the preliminary hearing. He points to the fact that where the identification is made from mug shots at a victim's home a defendant does not even have such protection as his own presence at a lineup would afford him. He therefore argues that whatever may be the rule concerning retroactivity of *Wade* and *Gilbert* with respect to lineups, he should, as a matter of fundamental fairness, have the right to counsel where he is not present at the identification but has already been charged with the crime.

We disagree, at least on the facts of this case. At the trial defendant had every opportunity to explore the actual fairness of the identification procedure. Apparently his trial attorney was not as skeptical as appellate counsel, for he did not even request discovery of the photographs as he could have done. (*Norton* v. *Superior Court,* 173 Cal.App.2d 133 [343 P.2d 139]; contra *Simmons* v. *United States,* 390 U.S. 377, 386-389 [19 L.Ed.2d 1247, 1254-1256, 88 S.Ct. 967].) Mrs. V. was cross-examined in great detail about the circumstances of the identification and nothing which even hints at unfairness was developed. To be sure, the presence of counsel could serve several prophylactic purposes as pointed out in *Wade* and *Gilbert,* but since the *Stovall* and *Feggans* courts did not believe the absence of counsel makes an identification procedure automatically unfair, we are not disposed—and certainly not compelled—to go them one better.

It is true that where defendant has been put through a lineup with others, he has some knowledge concerning the fairness of the procedure even if he has no counsel, while he has no way of knowing the type and number of photographs shown to a witness in the privacy of a home. On the other hand, barring police perjury, the discovery process gives him a much better opportunity to reproduce to the jury at least one of the important factors affecting the fairness of the identification—the very photographs shown to the witness. As noted, defendant did not avail himself of that opportunity. (Cf. *People* v. *Pedercine,* 256 Cal.App.2d 328, 334-337 [63 Cal.Rptr. 873].)

██ Nor, on the issue of fundamental fairness, should we ignore the particular circumstances of this case. (*Simmons* v. *United States, supra*: ". . . Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground

only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. . . ." (*Ibid.*, p. 384 [19 L.Ed.2d at p. 1253].)

What appeared to have happened is this: after Mrs. V. was attacked in February 1966, she reported the incident to the police. Some time thereafter she left town for a professional engagement in Texas. On June 3, 1966, defendant was arrested and identified by Carol and Shirley. In view of the strikingly similar modus operandi the police apparently put two and two together and charged defendant with the kidnaping of Mrs. V. The preliminary examination was set for June ·20.[3] She returned just before that date. Armed with a subpoena and the photographs the police appeared at her house on the morning of June 20. She identified defendant and was then served with the subpoena.

Under the circumstances we find no unfairness.

What we have said so far disposes of all points raised by defendant on this appeal.

The judgment is affirmed.

Stephens, J., and Moor, J. pro tem.,* concurred.

A petition for a rehearing was denied August 16; 1968, and appellant's petition for a hearing by the Supreme Court was denied September 18, 1968.

---

[3]It did not start until June 21.

*Assigned by the Chairman of the Judicial Council.