[Crim. No. 16700. Second Dist., Div. Five. Aug. 24, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY DAVID DONTANVILLE, Defendant and Appellant.

## COUNSEL

Hollopeter & Terry and Harvey A. Schneider for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Howard J. Schwab, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

KAUS, P. J.—This is an appeal from a judgment of conviction of a violation of section 288 of the Penal Code. The circumstances surrounding the conviction are as follows:

On July 31, 1967, the offense charged in the present case was committed upon Kelly Lee Hopper.

On September 18, 1967, defendant was arrested and charged with the August 9, 1967, murder of two young girls, the Barili sisters.

On September 28, 1967, Kelly Lee Hopper and three of her brothers identified defendant by picking his photograph from a set of 13 assembled from a file of about 150 by Sergeant Koury of the Los Angeles sheriff's office.

Defendant's trial on the murder charges started November 20, 1967. Kelly Lee Hopper, her mother, and her stepbrother, Raymond Marlow, testified at that trial on November 21, 1967. Defendant was convicted of murder in the first degree. Defendant obtained new counsel, moved for and was granted a new trial on the murder charges. After a month-long trial a jury found him not guilty. No evidence concerning the instant charge was presented at the second murder trial. Following his acquittal defendant was committed to department 95 of the superior court where proceedings were conducted to determine whether he was mentally ill. Defendant was adjudicated sane. He was then arrested on the instant charge

on a complaint filed April 23, 1968, which resulted in an information filed May 28, 1968.

Following the verdict in the instant case, criminal proceedings were adjourned and mentally disordered sex offender proceedings instituted. Defendant was found to be a probable mentally disordered sex offender and was ordered committed to Atascadero State Hospital for 90 days. He was returned to the court as unsuitable for hospital treatment. Criminal proceedings were reinstated and defendant was sentenced to state prison.

## FACTS

On July 31, 1967, at about 11 a.m., Mrs. Audrey Hopper went to Legg Lake Park in the County of Los Angeles. With her were six children:[1] Danny Hopper, age 11, Glen Marlow, age 10, Mark Hopper, age 8, Raymond Marlow, age 8, Kelly Lee Hopper, age 7, and Curtis Hopper, age 4. Mrs. Hopper sat on the grass with Curtis. The other five children left her presence and went to play elsewhere in the park. A man approached the five children and asked them to help him find his dog. He offered a 50 cent reward. He directed the three older boys to go in one direction and said he would take the younger ones and go in an opposite direction. The man took Kelly and Raymond by the wrist and walked a distance with them. He then left Raymond beside a tree and told him to stay there. The man walked away with Kelly. He took her behind some towers, squatted down in front of her, placed his hand inside her pants and rubbed her bare skin. He then took her to a tree, told her to wait there and walked off. Raymond meanwhile had run to his mother and told her a man had taken Kelly. Mrs. Hopper called the police. The older boys had become suspicious and had gone looking for Kelly. They found her hiding in some bushes, crying. Mrs. Hopper arrived at the scene at about the same time. Kelly said the man had put his hand inside her pants and rubbed her stomach. She repeated this complaint to her mother after they returned home at about 1:10 p.m.

On September 28, 1967, Glen, Mark, Raymond and Kelly identified defendant's picture as being one of the man in the park. All five children identified defendant at the trial.

Defendant attempted to establish an alibi defense.

## DISCUSSION

 1. Defendant claims that the People's delay in filing the charges in the instant case resulted in a denial of due process and of the right to a fair and speedy trial.

---

[1]All were either the children or stepchildren of Mrs. Hopper.

■ As defendant admits, the right to a speedy trial pertains to the time elapsing between the filing of a complaint, information or indictment and the time the defendant is brought to trial. (*People* v. *Humphrey,* 220 Cal. App.2d 451, 455 [33 Cal.Rptr. 822].) He contends, however, that an undue delay between the commission of the act and the filing of a complaint results in a denial of due process and of the right to a fair trial. ■ A defendant's basic protection against unreasonable delay is, of course, the statute of limitations. (*People* v. *Humphrey, supra; People* v. *Aguirre,* 181 Cal. App.2d 577, 579 [5 Cal.Rptr. 477].) In order to establish a denial of due process based upon a delay short of the statutory period the defendant must show that there was no legitimate reason for the delay and that he was prejudiced by it. (*People* v. *Alvarado,* 258 Cal.App.2d 756, 760 [66 Cal. Rptr. 41]; *People* v. *Gilmore,* 239 Cal.App.2d 125, 129 [48 Cal.Rptr. 449].) ■ Defendant has failed to carry that burden of proof.

Citing *Ross* v. *United States,* 349 F.2d 210 [121 App.D.C. 233] defendant claims that a showing of prejudice alone will suffice, even if the government's delay is based on a legitimate reason. Whether *Ross* so holds is doubtful. It appears that the court found the last three months of the delay to be unnecessary when viewed in the light of the particular circumstances of the case: that defendant had been convicted on the uncorroborated testimony of an undercover officer who, himself, had no recollection of the narcotics purchase he had made from defendant seven months before the arrest and whose testimony was admitted solely on the theory of "past recollection recorded" in the agent's notebook. In any event *Ross* seems doubtful authority even in its own circuit: see *Powell* v. *United States,* 352 F.2d 705, 709 [122 App.D.C. 229].[2] (See also *People* v. *Campa,* 7 Cal. App.3d 467, 469-470 [81 Cal.Rptr. 710].)

Here there were obvious and legitimate reasons for the delay. Had defendant been convicted of the murder charges and been sentenced to death or even to imprisonment for life, the present prosecution might have been regarded as futile since it could result in no greater punishment (Pen. Code, § 669) and might never have been instituted, thereby sparing the victim of the instant offense the ordeal of testifying again.

Another legitimate reason for not filing a complaint on the present offense is this: it necessarily would have caused prejudicial publicity in connection

---

[2] In *United States* v. *Deloney,* 389 F.2d 324, a seventh circuit case, *Ross* and *Powell* were synthesized as follows: ". . . We think we can distill from these decisions the rule that before that Court will dismiss an indictment because of preindictment delay, an accused must show he has been prejudiced by the delay. Then, the burden is on the Government to show the delay was the result of a valid police purpose." (389 F.2d at p. 325.)

with the murder trial. True, evidence of the July 31 incident was offered and admitted at the first murder trial, but that was done after the jury had been selected and only after the question of admissibility had, presumably, been ruled on by the court. Thereafter the presentation of this evidence was assigned as error on defendant's motion for a new trial. After that motion had been granted, the prosecution had to look forward to the necessity of picking another jury. Apparently at some time before the prosecution rested at the second murder trial, the decision had been made not to present Kelly's evidence. Since the People were so careful not to court error, it is perfectly understandable that they did not want to muddy the waters by the filing of the new complaint. The record before us contains a declaration signed by Joseph P. Busch, one of the prosecutors at the second murder trial. In this declaration he points out that the prosecution could have filed a 288 complaint before the second trial and attempted to consolidate the new charge with the pending one. If successful it might have been able to offer Kelly's evidence without having to rely on any "common scheme or plan" theory. On the whole it seems that the prosecution leaned over backwards to be fair and that there was a legitimate reason for the delay.

We turn to prejudice. Defendant knew of the instant charges as early as November 20, 1967, when the first trial started.[3] His interest in refuting the charges was certainly as great, if not greater, at the murder trial as it was at the instant trial. He, therefore, could have begun to establish his alibi defense and line up his alibi witnesses as early as November 20, 1967. If he failed to do so, this failure is not the fault of the People.[4]

With respect to the delay between September 28, 1967, the date defendant was identified as the perpetrator of the instant offense, and November 20, 1967, the date he learned of the accusation, any prejudice to the defendant is purely speculative. On that state of the record he cannot prevail. (Cf. *United States* v. *Ewell,* 383 U.S. 116, 122 [15 L.Ed.2d 627, 632, 86 S.Ct. 773].)

■ 2. Defendant contends that the photographic identification process by which the children identified him was unconstitutionally suggestive; that the People failed to prove by clear and convincing evidence that the in-court identification of defendant by the children was not tainted by the result of their exposure to the photographs; and that defendant was denied

---

[3]The expected testimony was adverted to in the People's opening statement.

[4]In *United States* v. *McCorkle,* 413 F.2d 307, 309, it is pointed out that the critical time interval is that between the time when the charges could have been filed and the defendant's notice thereof, not the actual filing. On that basis the court distinguished *Ross* v. *United States, supra.*

the right to counsel during the photographic identification. He argues that the court therefore should have suppressed the in-court identification.

With respect to the argument that defendant was denied the right to counsel, the rule is otherwise. ■ A photographic, as distinguished from an actual lineup, is not necessarily a critical stage at which the presence of counsel is required. This was established in *Simmons* v. *United States*, 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967]. There the Supreme Court recognized "the hazards of initial identification by photograph" but said that any "danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error." *Simmons* has been followed by a substantial number of cases in this state. (E.g., *People* v. *Stuart,* 3 Cal.App.3d 817, 821 [83 Cal.Rptr. 841]; *People* v. *Green,* 3 Cal.App.3d 240, 246 [83 Cal.Rptr. 491]; *People* v. *Short,* 269 Cal.App.2d 746, 748 [75 Cal.Rptr. 156]; *People* v. *Padgitt,* 264 Cal.App.2d 443, 449 [70 Cal.Rptr. 345].)

■ Defendant argues that these cases are not in point because when the children identified him from the photographs, he was already in custody and, presumably, had counsel. That is true only of the cases he distinguishes but not of *People* v. *Padgitt, supra,* where the photographs were shown to one of the complaining witnesses the day before the preliminary hearing. It seems noteworthy that in *Simmons* the Supreme Court bases its qualified approval of the photographic lineup not on the impracticability of securing counsel for a suspect not in custody or, perhaps, not even yet under suspicion, but on the ability of trial counsel to demonstrate any "potential for error" by cross-examination. This rationale, of course, goes right back to the rationale of *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], which, in a nutshell, is that the subtle factors which may make an actual lineup unfair in many cases simply cannot be demonstrated at the trial. "In short, the accused's inability effectively to reconstruct at trial any unfairness that occurred at the lineup may deprive him of his only opportunity meaningfully to attack the credibility of the witness' courtroom identification." (*United States* v. *Wade, supra,* 388 U.S. at pp. 231-232 [18 L.Ed.2d at pp. 1159-1160].)

The California cases have pointed out that the chief difference between a photographic line-up and the type discussed in *Wade* is the ability to reproduce much of what transpired by the production of the photographs themselves. This was done here. True, not even the fairest set of photographs makes an identification from it necessarily constitutionally adequate. There is still room for all kinds of suggestions which cannot be exposed at the trial except through the ordinary processes of direct and cross-examination.

That, however, is true of a great deal of police testimony. Thus we have never heard it successfully argued that a defendant, although he may be in custody and have counsel, may have his attorney witness an autopsy or look over the chemist's shoulder while he determines that the white powder taken from defendant is heroin.

We have examined the photographs and have concluded that defendant's argument that they are impermissibly suggestive is not well taken. The primary basis of defendant's argument is that the principal identifying feature on which the children relied was a distinctive mustache with a space in the center. He argues that his was the only photograph with such a mustache.[5] While it is true that defendant's photograph has the mustache with the most pronounced gap in the center, others of the photographs have mustaches with at least slight gaps. Furthermore, on examination it seems quite unlikely that the gap in the mustache is unduly striking to one going through the photographs, even when the viewer is specifically looking for that feature.

The following evidence in the record supports the conclusion that defendant's identification was not the result of the witnesses' exposure to an unfair assemblage of photographs. Sergeant Koury, the police officer who assembled the photographs, testified that he selected photographs from his files which fit the general description given by the children and also depicted persons who had committed similar offenses. If defendant believed that an

---

[5]The record is somewhat obscure with respect to a matter raised during the oral argument of this appeal, namely whether Sergeant Koury knew, before assembling the photographs shown to the children, that they would be looking for the hairless space in the center of the molester's mustache. An early attempt by the prosecution to elicit from him "what type of a description" he received of the mustache was blocked by a defense objection. During cross-examination he appeared to testify that all he knew about the mustache was what was on the police report, in which the mustache was not particularly described. However, on redirect examination the prosecutor asked the following question: ". . . The description that you received of the type of mustache from these children, can you categorize the description you had? Was it a light mustache, a bushy mustache, a handlebar, or Hitler? What were you looking for?" He got the following answer: "No, it would be a light or—it wasn't a handlebar mustache, it wasn't a square cut-off bush type; it was a thin mustache that covered the entire upper lip, with the space in the middle." The matter was not alluded to further, except that during his closing argument defense counsel, without challenge, made the following statement: "I should say also that—and I'll point this out in more detail—and when the little children made their reports to the police, they didn't speak of a light moustache, they spoke of a moustache with a gap in the middle. . . ." We have been unable to find any support for this statement, other than the answer quoted above. In any event it appears not to have been of any great moment to the parties whether Koury knew or did not know about the gap. We agree. If defendant's photograph was impermissibly suggestive, it matters little whether the suggestion was inadvertent or deliberate.

unfair selection had been made, he could have subpoenaed Koury's entire file of photographs to demonstrate that fact. He did not do so.

Further, before the children were shown the pictures, Koury ascertained from Mrs. Hopper that they had not seen photographs of defendant in connection with his arrest for the Barili murders and had not heard his name. Each child was called in separately to view the photographs and admonished not to discuss what transpired with the others. Kelly, Mark and Raymond immediately selected defendant's picture. Glen said he was unable to identify anyone from the photographs. He was then shown a second batch of photographs, these being full length pictures. He selected defendant's photograph from this second group. Glen then went through the first group of photographs again and selected defendant's picture as possibly the same man. The fact that Glen did not pick defendant's picture out of the first group immediately is strong evidence that the photographs were not suggestively assembled.

Sergeant Koury then admonished Mrs. Hopper not to let the children see any publicity concerning defendant in connection with the Barili case.

At the trial below, Dan, Glen, Mark, Raymond and Kelly all testified and all identified defendant as the man in the park. Dan's identification was undeniably untainted by exposure to the photographs since he had not attended the photographic lineup, having been home sick at the time.

The record contradicts defendant's contention that the sole basis for his identification by the children was the mustache with the gap in the center. The children identified a number of other distinctive features which they remembered about the man in the park. Danny described a lower lip that "bends a little" and his tilting forward as though off balance. Glen described his voice as deep, said he remembered his whole face, mentioned his lower lip being down and that he "sort of leaned over." Mark described a deep, slow-speaking voice, a protruding, drooping lower lip, and messy hair which hung down on his face. Raymond noted his bottom lip hung down. Kelly also noticed his lower lip hung down.

The jury was free to assess the degree to which the children's description matched the defendant whose appearance was before them and whose voice they heard when he testified in his own behalf.

We cannot say that "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Simmons* v. *United States, supra,* 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253].)

■ 3. Defendant contends that the court erred in permitting Mrs.

Hopper to testify concerning a complaint by Kelly made after Mrs. Hopper and Kelly had gone home, when she had already testified to a similar complaint made immediately after mother and child had been reunited in the park. There is some question in our mind whether the point, as presented on appeal, has been properly preserved. During the opening statement the prosecutor said that he would prove both complaints. There was an objection "to any hearsay. . . . I simply object to a recital of details of the complaint." The objection was overruled. There was no further objection while Mrs. Hopper testified.

Thus it seems doubtful that the present objection, the repetition of evidence of the complaint, was properly drawn to the trial court's attention. In any event, the error, if any, is harmless beyond any doubt. The fact that somebody did something to Kelly was never really in dispute. Defense counsel did argue that whatever was done to her was not for the purpose of arousing anybody's passions or sexual desires and, of course, that whoever did it was not defendant.

■ 4. Mrs. Brooks, one of defendant's alibi witnesses, was impeached with a tape recording of a telephone conversation between the prosecutor and herself. Citing *Katz* v. *United States,* 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507]; *Berger* v. *New York,* 388 U.S. 41 [18 L.Ed.2d 1040, 87 S.Ct. 1873]; and *Lee* v. *Florida,* 392 U.S. 378 [20 L.Ed.2d 1166, 88 S.Ct. 2096], defendant claims a violation of his Fourth Amendment rights, as well as of section 605 of the Federal Communications Act.

The tape recording was made by Sergeant Koury, with the permission of the prosecutor, by means of an induction coil.

There is nothing in *Katz* or *Berger* which affects eavesdropping to a telephone conversation with the consent of one of the parties. Similarly section 605 of the Federal Communications Act stands unaffected by *Lee,* which simply makes the act applicable to intrastate conversation. See generally, *Rathbun* v. *United States,* 355 U.S. 107 [2 L.Ed.2d 134, 78 S.Ct. 161]; *People* v. *Dement,* 48 Cal.2d 600 [311 P.2d 505]; *People* v. *Malotte,* 46 Cal.2d 59, 63-64 [292 P.2d 517]. The point has no merit.

■ 5. Defendant cites several instances of conduct by the prosecutor which he claims amount to prejudicial misconduct. He complains, specifically, about allusions which the prosecutor made during opening argument to certain hearsay statements by the children; questions asked of Sergeant Koury concerning a conversation which he had with Kelly in which she discussed her fear of defendant; references to defendant's poor attendance

record at work made while the prosecutor questioned his supervisor; and statements in closing argument to the jury about the lasting traumatic effects upon the victims of child molestations. In each of the above instances a defense objection was sustained and the jury admonished to disregard the prosecutor's statement or the answer to his question.

■ The burden of proving prejudicial misconduct rests with the defendant (*People* v. *Beivelman*, 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913]; *People* v. *Asta*, 251 Cal.App.2d 64, 86-87 [59 Cal.Rptr. 206]), who here has made no showing of bad faith on the part of the prosecutor. ■ Furthermore, even where misconduct is shown, it does not provide grounds for reversal of judgment where the jury has been admonished to disregard the offending statements, unless they are of such a character as to make their effects incurable by admonition. (*People* v. *Perez*, 58 Cal.2d 229, 247 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946]; *People* v. *Lyons*, 50 Cal.2d 245, 262 [324 P.2d 556].) ■ The admonitions here were effective curatives.

Additionally, it is difficult to see how defendant could possibly have suffered any prejudice by the reference to his poor work attendance. If anything, this corroborated his defense which was that he regularly frequented two bars during work hours and was so engaged at the time Kelly was molested.

■ Defendant complains also of the prosecutor's attempt to discredit a defense witness, during closing argument, by stating that the reason she remembered the day of the offense was because her children had been taken from her that day because of neglect. The court ruled that this was proper argument. This was a correct recitation of the witness' testimony. That testimony had been elicited from her on direct examination by the defense. The taking of the children had been stressed as the reason why she remembered the day in question. The prosecutor's comment upon it was not misconduct.

■ Neither individually nor cumulatively (*People* v. *Zerillo*, 36 Cal.2d 222 [223 P.2d 223]) do the instances of conduct complained of warrant reversal.

■ 6. Defendant argues that the evidence was insufficient as a matter of law to sustain the conviction. He asserts that the act of rubbing Kelly's stomach was too innocuous to constitute a violation of section 288 of the Penal Code. The statute is violated, however, whenever a lewd or lascivious act is committed on the body *or any part thereof* of a child under 14. (Pen. Code, § 288.) While defendant denies that the act of which he stands convicted was offensively sexual in nature, the extreme youth of the victim

and the circumstances of the incident warrant the jury's conclusion that the touching was done with the requisite intent. It is not necessary that the private parts of the body be touched to sustain a conviction under the section. (*People* v. *Epperson,* 7 Cal.App.2d 125 [45 Cal.Rptr. 359]; *People* v. *Halistik,* 69 Cal.App. 174 [230 P. 972].)

7. Defendant asserts that the jury was improperly instructed. The jury was instructed as follows: "It is not necessary in committing the crime of violation of Penal Code Section 288 as charged against the defendant in count 1 of the information that the bare skin of the minor be touched. The touching, fondling, rubbing or feeling of the body, members or private parts of a minor under the age of 14 years, with the intent of arousing, appealing to and gratifying the lusts, passions and sexual desires of either the minor or the accused, constitutes the offense charged, even though such touching, fondling, rubbing or feeling was through the clothing of the minor."

Defendant objects to the reference in the above instruction to touching of the private parts, arguing that the evidence is undisputed that Kelly was touched only on the stomach. This statement of the evidence is not entirely correct. While it is true that Kelly testified that defendant touched her stomach, she also participated in a demonstration which the prosecutor conducted in which he stuck his hand in the pants Kelly had worn on July 31, 1967, and which were admitted into evidence. Kelly verified when his hand was as far down as defendant's had been and the record reflects that his hand was then in the crotch area. The jury had a right to believe that the demonstration was more accurate than Kelly's version of where the man had touched her. The instruction was a correct statement of the law. The section dealing with the touching of the private parts was not emphasized. There was no error.

Defendant complains of an instruction that lack of consent was not an element of the offense, claiming that the record is devoid of evidence of Kelly's having consented. The record, however, is also devoid of evidence that she protested. The instruction was a correct statement of the law and was not inapplicable to the facts of the case. It is difficult to see how the defendant could have been prejudiced by it.

Finally, defendant complains that the court, after giving the usual cautionary instruction regarding the difficulty of defending against easily made sexual charges, added the instruction that if convinced of defendant's guilt beyond a reasonable doubt, the jury should return a guilty verdict. He argues that this constituted reversible error, citing *People* v. *Hurlburt,* 166 Cal.App.2d 334, 338 [333 P.2d 82, 75 A.L.R.2d 500]. The language in *Hurlburt* upon which defendant relies is merely dicta, which has not

been followed by later cases. (*People* v. *Ragen,* 262 Cal.App.2d 392, 402 [68 Cal.Rptr. 700]; *People* v. *Scarborough,* 171 Cal.App.2d 186, 191-195 [340 P.2d 76].)

*Hurlburt* relied on *People* v. *Lyons,* 47 Cal.2d 311 [303 P.2d 329]. *Lyons* presented a unique factual situation, however, in which the portion of the instruction complained of was added in the trial judge's handwriting to the end of a printed instruction, was the only instruction in the judge's handwriting, and was taken into the jury room. Under those circumstances the court in *Lyons* found that the instruction had received undue emphasis. The facts of the instant case are different. The portion of the instruction complained of was printed as part of the general cautionary instruction and received no particular emphasis. It was not erroneously given. (*People* v. *Ragen, supra; People* v. *Scarborough, supra.*)

The judgment is affirmed.

Stephens, J., and Reppy, J., concurred.