THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* IGNACIO GÓMEZ INCERA, Defendant and Appellant.

No. CR-67-156.      Decided May 6, 1969.

244

*José M. Tejada* for appellant. *J. F. Rodríguez Rivera, Acting Solicitor General,* and *Juan José Ríos Martínez, Assistant Solicitor General,* for The People.

MR. JUSTICE DÁVILA delivered the opinion of the Court.

The identification of the accused is an essential phase of the criminal prosecution. *United States* v. *Wade,* 388 U.S. 218 (1967) ; *Gilbert* v. *California,* 388 U.S. 263 (1967) ; *Stovall* v. *Denno,* 388 U.S. 293 (1967) ; *Simmons* v. *United States,* 390 U.S. 377 (1968) ; *Foster* v. *California,* 37 U.S.L. Week 4281 (1969).

In the *Wade* and *Gilbert* cases the Supreme Court of the United States considers extensively the problem of the identification. It makes a study of this aspect of the criminal prosecution and establishes that the accused has the right to the assistance of counsel when presented for lineup identifica-

tion. But in the *Stovall* case it considers further that the confrontation conducted by showing the witness a single suspect—who, according to the police, is necessarily liable for the act investigated—is a denial to the accused of the due process of law. In *Foster* v. *California*, the Supreme Court of the United States stated in footnote 2 that "the reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury. But it is the teaching of *Wade*, *Gilbert*, and *Stovall*, . . . that in some cases the procedures leading to an eyewitness identification may be so defective as to make the identification constitutionally inadmissible as a matter of law." In *People* v. *Ballott*, 233 N.E.2d 103 (1967), the Court of Appeals of New York stated in identical terms: " 'Absent "imperative" circumstances necessitating resort to such a procedure, the practice of having a witness secretly view, for identification purposes, only the very suspect whom the police have taken into custody for the crime can be "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to amount to a denial of due process of law.' " In Crawford, *Due Process in Extra-Judicial Identifications*, 24 Wash. & Lee L. Rev. 107 (1967) it was stated:

"A show-up is strongly suggestive of guilt because 'the emotions of the victim . . . create a predisposition to believe the worst of a person brought before him as the probable offender, especially when there is no alternative suspect.' In regard to show-ups, Professor Wigmore states that 'there is no excuse for jeopardizing the fate of innocent men by such clumsy antiquated methods; a recognition under such circumstances is next to worthless.' "

See also, *Crume* v. *Beto*, 383 F.2d 36 (5th Cir. 1967); *People* v. *Caruso*, 436 P.2d 336 (Cal. 1968); *People* v. *Pedercine*, 63 Cal. Rptr. 873 (Calif. C.A. 3d Dist. 1967); *People* v. *Irvin*, 70 Cal. Rptr. 892 (Calif. C.A. 1st Dist. 1968);

*People* v. *Espinoza Menchaca*, 70 Cal. Rptr. 843 (Calif. C. A. 2d Dist. 1968).

■ A fair and impartial trial is not possible unless the method of identification of the suspect is duly warranted. The major errors committed in the administration of justice are the result of mistaken identification of the accused. In a study of sixty-six cases decided it is set forth that in twenty-nine of them, the accused was mistakenly identified. See Borchard, Convicting the Innocent (Garden City, 1932); Williams & Hammelmann, *Identification Parades-I*, 1963, Crim. L. Rev. 479.

The last article cited states:

"The reasons for the danger of this kind of evidence are not hard to discover. Evidence of identity is opinion evidence par excellence, a form of proof against which English law has always guarded with particular care. As Evatt and MacTiernan JJ. remarked in the Australian case of *Craig*, 'An honest witness who says "The prisoner is the man who drove the car," whilst appearing to affirm a simple, clear and impressive proposition, is really asserting: (1) that he observed the driver, (2) that the observation became impressed upon his mind, (3) that he still retains the original impression, (4) that such impression has not been affected, altered or replaced, by published portraits of the prisoner, and (5) that the resemblance between the original impression and the prisoner is sufficient to base a judgment not of resemblance but of identity.' The complexity of this issue is obscured when a witness is asked, as he commonly is, either by prosecuting counsel or by the judge: 'And do you see the man you speak of in the court today?' The answer to this question, by a gesture in the direction of the dock, is a foregone conclusion: it looks disarmingly plausible and impresses the jury, and yet the question whether the witness now recognizes the defendant as the criminal is of such trifling probative force that it ought not to be asked, except in the context of three other questions: when and in what circumstances did the witness first recognize the defendant as the man; did he have any difficulty in recognizing him; and by what marks did he recognize him? Even these further questions might not save this kind of evidence from the

danger of misleading juries, but at least they would furnish some opportunity of revealing flaws in the identification."

See also, Gorphe, "*Showing Prisoners to Witnesses for Identification*," 1 American Journal of Police Science 79 (1930); *United States* v. *Wade, supra* at p. 228.

■ Having knowledge of the errors which may be committed in the identification of a person who has been observed for a limited period of time, under tension and nervous strain which necessarily affect the sense of perception, the courts should surround this phase of the process of investigation with the necessary safeguards to prevent the miscarriage of justice. The in-court, identification which may be conducted on the day of the trial, cannot be relied upon. The identification at the trial would be tainted with the flaws which characterized the one conducted during the investigatory stage. See *People* v. *Caruso, supra;* IV Wigmore, On Evidence, § 1130 (1940 ed.). The witnesses had already determined that the accused was liable. The identification at the trial is a mere formality. As it was stated in the article written by Williams and Hammelmann, *supra,* and which is cited in *Wade* at p. 229: "It is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial."

Being conscious of the fact that the act of the identification is decisive for the accused, rules have been established to conduct it. In the *Wade* case, the Supreme Court of the United States cites in a footnote Professor Murray's proposition which appears in his article *The Criminal Lineup at Home and Abroad*, Utah L. Rev. 610, 627–628 (1966). He proposes the following:

"Most, if not all, of the attacks on the lineup process could be averted by a uniform statute modeled upon the best features

of the civilian codes. Any proposed statute should provide for the right to counsel during any lineup or during any confrontation. Provision should be made that any person, whether a victim or a witness, must give a description of the suspect before he views any arrested person. A written record of this description should be required, and the witness should be made to sign it. This written record would be available for inspection by defense counsel for copying before the trial and for use at the trial in testing the accuracy of the identification made during the lineup and during the trial.

"This ideal statute would require at least six persons in addition to the accused in a lineup, and these persons would have to be of approximately the same height, weight, coloration of hair and skin, and bodily types as the suspect. In addition, all of these men should, as nearly as possible, be dressed alike. If distinctive garb was used during the crime, the suspect should not be forced to wear similar clothing in the lineup unless all of the other persons are similarly garbed. A complete written report of the names, addresses, descriptive details of the other persons in the lineup, and of everything which transpired during the identification would be mandatory. This report would include everything stated by the identifying witness during this step, including any reasons given by him as to what features, etc., have sparked his recognition.

"This statute should permit voice identification tests by having each person in the lineup repeat identical innocuous phrases, and it would be impermissible to force the use of words allegedly used during a criminal act.

"The statute would enjoin the police from suggesting to any viewer that one or more persons in the lineup had been arrested as a suspect. If more than one witness is to make an identification, each witness should be required to do so separately and should be forbidden to speak to another witness until all of them have completed the process.

"The statute could require the use of movie cameras and tape recorders to record the lineup process in those states which are financially able to afford these devices. Finally, the statute should provide that any evidence obtained as the result of a violation of this statute would be inadmissible."

See also, Joseph, *Due Process at the Lineup*, 28 La. L. Rev. 259 (1968).

It is interesting to point out that the Spanish Criminal Prosecution Law provided in its § 369 that "The identification shall take place by placing before the person who is to make it the person to be identified, producing said person in union with other similar external circumstances. In the presence of all of them or from a point where he cannot be seen, as the judge may consider more advisable, the person to make the identification shall state if the person to whom he may have referred in his declarations is in the group, and in an affirmative case he shall designate him in a clear and specific manner. In the record made all the circumstances of the act shall be stated, as well as the names of all who may have composed the group."[1] See also, the method proposed by Wigmore in his work on evidence, Vol. III, § 786 (a), p. 163.

---

[1] The Code of Criminal Procedure of Mexico is very explicit. Chapter X contained therein provides:

"Section 217.—Whoever shall refer to a specific person in his declaration or in any judicial act, shall do it in a clear and specific manner in order that there may be no doubt as to what person the former refers by mentioning his name, surname, address and any other personal circumstances which may help to identify him.

"Section 218.—Whenever the deponent is ignorant of the details mentioned in the preceding section, but states that he can recognize the person if he were produced, the confrontation shall be conducted. It shall also be conducted when the deponent asserts that he knows a specific person and there is reason to suspect that he does not.

"Section 219.—In conducting the confrontation the following precautions shall be taken:

"I. That the person object of the same shall not disguise or disfigure himself, or conceal the signs or marks which may aid the identifier;

"II. That said person shall appear together with other persons similarly garbed, and even having, if possible, the same marks as the person to be confronted, and

"III. That the persons who accompany the person who is to be confronted, be of analogous class, taking into consideration their education, manners, and special circumstances.

"Section 220.—If any of the parties demand that further precautions, in addition to those provided in the preceding section, be taken the judge

250

■ In *Stovall* v. *Denno, supra,* and *Simmons* v. *United States,* 390 U.S. 377 (1968), the Supreme Court of the United States, after pointing out what errors in the conduct of the confrontation of a suspect constitute a violation of the due process of law states that the determination of the violation depends on the totality of the surrounding circumstances.[2]

After stating the law let us consider the facts.

Silvio Morales Pérez and Vicente Felipe were the owners of a jewelry shop. Upon liquidation of the business, Silvio Morales stored in his residence at 1407 Georgetti Street, Stop 20, the jewels which corresponded to him. He affirms that they were valued at $100,000.

---

may grant them, provided they do not impair the truth or appear futile or suspicious.

"Section 221.—The person to be confronted shall choose his place among the participants in this act and may request the exclusion from the group of any person who seems suspicious to him. It is incumbent upon the judge to grant or deny the petition.

"Section 222.—The identification shall take place by placing the person to be identified in a lineup. The deponent shall be sworn to say the truth and he shall be interrogated:

"I. Whether he persists in his previous declaration;

"II. Whether he knew previously the person to whom he attributes the act, whether he knew him at the time of the commission of the act under investigation, and

"III. Whether he has seen him after the commission of the act, where, why, and for what reason.

"Section 223.—The deponent shall be taken before the lineup participants; if he has affirmed that he knows the person to be confronted, he will be permitted to view him thoroughly, and he will be advised to touch the person designated by him with his hand, stating the differences or similarities observed between the present condition and the condition at the time to which his declaration refers.

"Section 224.—When there are several deponents or persons to be confronted, as many separate acts shall take place as there are confrontations to be conducted."

[2] In the *Stovall* case it was determined that the circumstances that the star witness was at death's doors, justified the fact that the suspect was shown singly for the purpose of identification. In the *Simmons* case five witnesses separately identified Simmons in a series of photographs where he appeared together with other persons. Although the identification procedure employed was upheld it is pointed out in footnote 6 at page 386 that other safeguards could have been adopted to warrant defendant's rights.

On the afternoon of February 26, 1966 at about 2:30 p.m. two persons arrived at the residence of Morales. Morales' wife, who at that time was alone with a one-month-old baby, received them. She testified that "at that time . . . they knocked at the door, I went to the door and when I opened it I saw two men, one of them was wearing a checked coat and the other was wearing dark pants and a green shirt, apparently of nylon." She said that the men informed her that they had come for some merchandise to take it to Mayagüez, but that she told them that she would not intervene with the merchandise, that they had to wait for the secretary who had gone to buy some milk for the baby. "When I said so, my baby cried, he was on the bed, I was changing his diapers and when I turned to go to see my baby, when I turned, this man [pointing to appellant Gómez Incera], or they, aimed a fire arm at me and took me to the room where my baby was." She testified that they aimed at her "with a firearm, with a pistol, the front part of which was rather long."

At that time someone knocked at the door. It was the secretary. They opened the door and the former found herself facing one of the assailants who was aiming a pistol at her. She tried to scream, but Mrs. Morales told her not to do so.

The prosecuting attorney asked, "Did she explain to you at that time why you should not scream?" and the witness answered, "It was not necessary because when I heard her voice I immediately looked and Ignacio Gómez [the appellant] was aiming at her behind her back."

The men escaped with the jewels that Morales had stored in his house. The police was informed and the investigation commenced. A tip was received and the police seized the jewels in the house of one Naim Ferrá. When the police appeared at appellant's house to arrest him, it requested the permission of his wife to enter. She granted the permission alleging that appellant was not at home. He was found hiding under a bed. Two days after the occurrence of the facts Mrs.

Morales and the secretary were taken to police headquarters for the purpose of identifying appellant. They identified him immediately. On cross-examination by the defense, it was established that appellant was shown singly for the purpose of identification. The defense sought to establish that an identification conducted in that manner is not reliable. And generally it is not, as it has been decided by the Supreme Court of the United States in the *Wade, Gilbert, Stovall* and *Simmons* cases, *supra*. But those same cases have established that sometimes the reliability of the identification depends on the totality of the surrounding circumstances.

We must not forget that Mrs. Morales and the secretary testified that the entire transaction lasted from twenty to twenty-five minutes; that during that time they had the opportunity to observe the two men thoroughly; that they were not wearing any mask whatsoever. They narrated how appellant herein handed to the secretary some adhesive tape so that she would apply it on Mrs. Morales' mouth in order that the latter could not scream. That she could not do it, and then, appellant himself did it. The secretary affirmed that "I was nervous, but not to the extent of loosing lucidity or being unable to recognize a person." Mrs. Morales testified that at no time did she lose her consciousness or her faculties. "I could not efface it from my mind," she answered to the attorney for the defense.

■ Under these circumstances we are convinced that both witnesses had ample opportunity to observe appellant long enough to be able to identify him without any reservation that there might occur any miscarriage of justice. During more than twenty minutes they were observing him in broad daylight, and since the first identification was conducted only two days after the occurrence of the facts, there can be no reservation as to the commission of a mistake.

■ It could be argued that the foregoing does not militate against the fact that when the witnesses were taken to police headquarters for the identification of appellant he should have been produced together with other persons of similar external circumstances and garbed in the fashion described by the witnesses. The identification would have been more convincing and relevant. There is no doubt that that is so, but as we have seen, the identification made by the witnesses, according to the attendant circumstances in this case, is not less reliable. It must be stated that the authorities should exercise special care in surrounding the identification procedure with the necessary safeguards to duly guarantee the rights of the citizens under investigation. Until the corresponding rules are adopted it seems to us that substantially following, insofar as feasible, in conformance with our procedure, the provisions of § 369 of the Law of Criminal Procedure for Cuba and Puerto Rico, copied above, is sufficient guarantee. Thus, the recognition or identification shall take place by placing before the person who is to make it, the suspect or accused, producing said person together with other persons of similar external circumstances. In the presence of all of them or from a point where he cannot be seen, according to the determination of the person who is conducting the investigations, the person to make the identification shall state if the person to whom he may have referred in his statements is in the group, and if he is, he shall designate him in a clear and specific manner.[3]

Appellant maintains that the denial of the defense's last motion for the continuance of the case prejudiced the defendant. The denial of the trial judge was justified. It appears from the record that on previous occasions and at the request of the defense it had been continued, and that the reasons ad-

---

[3] It must be recalled that the Supreme Court of the United States in *United States* v. *Wade*, 388 U.S. 218 (1967) and *Gilbert* v. *California*, 388 U.S. 263 (1967) decided that an accused has the right to counsel at this stage of the proceeding.

duced on the last occasion did not justify the continuance. The examination of the record shows that the continuance did not prejudice defendant. The defense presented its case thoroughly and effectively.

The contention that the weapon was not described adequately lacks merit. There can possibly be no doubt as to the bearing of the weapon in the present case where it was used to intimidate and actually intimidated two persons for the purpose of stealing jewels valued at over one hundred thousand dollars. The description of the weapon made by the two eyewitnesses was sufficient.

■ The incident relating to the publication in a newspaper of information concerning the holding of the trial did not prejudice appellant. A newspaper published information to the effect that "the hearing of the trial continues today and it is expected that all the evidence will have been presented by Tuesday afternoon or Wednesday morning. Judge Miranda ordered the taking of security precautions in court in view of the reports which came to his knowledge in the sense that defendant had observed a threatening attitude toward prosecuting attorney Noriega." The defense moved for mistrial. The judge inquired from each and every one of the jurors whether they had read the information (without informing them the contents thereof) and each and every one of them answered negatively. The judge did not permit the defense to examine the gentlemen of the jury. The defense assigns this as an error. It was not. In view of the categorical answers of the jurors to the effect that they had no knowledge of the information, permitting the intervention of the defense would be of no avail.

The judgments appealed from will be affirmed.

Mr. Justice Rigau concurs in the result.