[Crim. No. 20088. Second Dist., Div. Five. May 8, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
OSCAR JAMES HENDERSON, Defendant and Appellant.

## COUNSEL

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Frederick R. Millar, Jr., and William R. Pounders, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**REPPY, J.**—After a jury trial, appellant Oscar James Henderson (hereinafter defendant) was found to have been guilty of robbery (Pen. Code, § 211), to have been armed at the time of commission of the robbery within the meaning of Penal Code section 12022.5, to have intentionally inflicted great bodily injury on the victim of the robbery, and to have been guilty of kidnaping in violation of Penal Code section 207.[1]

Probation was denied, and defendant was sentenced to the state prison for the term prescribed by law. Defendant appeals from the judgment of conviction.

### Facts

Between 7 and 7:15 p.m. on November 20, 1970, Donald J. Buesen went to the Harbor gas station at 2900 Robertson Boulevard to pick up the petty cash and take the pump readings for his brother who was in the hospital.

Buesen picked up the credit card paper work and money (about the amount of $300 in one Bank of America money pouch, and an amount in

---

[1] Prior to trial, on the People's motion, counts III and IV (grand theft, Pen. Code, § 487, and joyriding, Veh. Code, § 10851) were dismissed. By amendment to the information, defendant was charged with a prior felony conviction which he admitted.

the other which Buesen estimated as being possibly another $300) and placed them in the back seat of his car. He turned out the lights at the station and was getting into his car when he noticed three men on the corner who appeared to be hitchhiking. It was approximately 8:30 p.m. The three men walked over to the car, and one of them asked Buesen where La Cienega Boulevard was. Becoming suspicious, Buesen picked up a bat that was in his car. Immediately the door on the driver's side of his vehicle was opened, and Buesen saw that the man standing there was pointing a .38 pistol at him. The door on the right side of the car was opened, and the man on that side also pointed a pistol at Buesen. The three men got into Buesen's car with him. Two of them got in the front seat and forced Buesen to sit upon the console between the front seats. One got in the back seat. With one of the three men at the wheel of Buesen's car, they drove down Robertson Boulevard and turned onto National Boulevard. They questioned Buesen about the money he had in the Bank of America pouches. One of the men in the front seat told the man in the back seat to stuff the money in his pockets. The other man in the front seat took Buesen's wallet and began to tie his hands. Buesen tried to keep his hands apart, so that his bonds would be relatively loose. The man in the back seat hit him over the head a couple of times with a pistol and then asked him if he could breathe.

The car turned into an alley and stopped. Buesen estimated that the drive took approximately 10 to 15 minutes. The man in the right front seat and the man in the rear seat got out of the car. With guns drawn they took Buesen into a partial foundation at a darkened construction site. They told him to lie on his stomach, and they bound and gagged him. They got back into Buesen's car and left.

Buesen freed himself in approximately one and one-half minutes and reported the robbery to the police. He advised the police that the three men involved in the robbery were black, described each of them, told the police that they had taken his car, and gave them a description of the car.

In the early morning hours of November 21, 1970, Officer Burton Franks arrested defendant in the vicinity of 111th Place and San Pedro Street after running an auto status check on the car defendant was driving and discovering that it was stolen. Defendant was driving Buesen's car.

At the trial, Buesen identified defendant as the man who sat in the back seat of the car and testified that he was armed during the course of the robbery. He identified People's exhibit 2 as the pistol defendant used during the robbery.

Various alibi witnesses, including defendant himself, testified on defendant's behalf, tracing defendant's activities over the course of the evening of November 20, 1970. Their story tended to show that defendant could not have been at the Harbor gas station on Robertson Boulevard at the time of the robbery. Defendant testified further that he came to be in possession of Buesen's car when a man whom he did not know, but had met at a party that night, let him take the car to drive a friend; and that while he was driving the car the pistol (People's Exhibit 2) slid from under the front seat striking his foot as he brought the car to a halt at a stop light. On seeing the gun, defendant pushed it back under the seat.

I

The prosecution chose in this case to charge defendants with simple kidnaping, a violation of Penal Code section 207, although the facts as they developed at trial arguably might have supported a charge of kidnaping for the purpose of robbery, a violation of Penal Code section 209 (i.e., *People* v. *Timmons,* 4 Cal.3d 411 [93 Cal.Rptr. 736, 482 P.2d 648]). In so doing, the prosecution had two options open to it: (1) Proving that defendant had violated Penal Code section 209 and being content with a conviction of simple kidnaping, or (2) proving that the robbery involved herein had essentially ended when defendant and his accomplices secured the money and left the immediate scene and that a new and independent crime of simple kidnaping unconnected with any underlying crime occurred thereafter.

The holding of *People* v. *Daniels,* 71 Cal.2d 1119, 1139 [80 Cal.Rptr. 897, 459 P.2d 225], requires the prosecution in a Penal Code section 209 case to prove that the asportation involved was not solely to facilitate the underlying robbery or, if it was, to prove that the movements of the victim substantially increased the risk of harm over and above that necessarily present in the crime of robbery itself and the jury must be so instructed. Thus, in *People* v. *Timmons, supra,* 4 Cal.3d 411, 414, the asportation of two store employees in their own vehicle for a distance of five city blocks was indicated to be an integral part of the robbery within the meaning of *Daniels* because the vehicle was, in fact, the moving situs of the robbery. In *Timmons* the Supreme Court went on to stress the fact that the movement of the victims in that case did not substantially increase the risk of harm. (*People* v. *Timmons, supra,* at p. 415.) The *Daniels-Timmons* analysis applies as well to a conviction of simple kidnaping (Pen. Code, § 207) where an underlying crime is in fact proved. (*People* v. *Williams,* 2 Cal.3d 894, 902-903 [88 Cal.Rptr. 208, 471 P.2d 1008].)

However, in the case at bar, the trial court by its instruction put the case to the jury on the basis of the second theory alone. It gave the jury only one instruction on the crime of kidnaping which was, "Every person who unlawfully and with physical force moves any other person against his will and without his consent for a substantial distance where such movement is not merely incidental to the commission of some other crime is guilty of the crime of kidnaping." This instruction did not call on the jury to resolve the factual question whether the victim was subjected to a risk of harm substantially greater than necessarily present in the underlying felony.

Under this instruction the jury could not have found defendant guilty of kidnaping based on the facts proved regarding Buesen's asportation up to the time the money was taken from him. Here, as in *People* v. *Timmons, supra,* Buesen's car was the moving situs of the robbery, and the asportation clearly was an integral part of the underlying robbery. Under the instruction as given, the only possible theory left which the jury might have relied on in finding defendant guilty of kidnaping is that the crime of robbery had ended when the money was secured and the car driven to the building site and that a new and independent simple kidnaping unconnected with any underlying crime occurred when Buesen was taken from the car and left bound and gagged at the site. However, this construction of the facts is erroneous as a matter of law. In *People* v. *Beaumaster,* 17 Cal.App.3d 996 [95 Cal.Rptr. 360], one of the defendants took the victim's purse in a laundromat, then forced her into his accomplice's car and drove off with her. Defendant argued that the robbery was completed in the laundromat and that it could not be found that the subsequent asportation was kidnaping for the purpose of robbery. This court, holding that the kidnaping was for the purpose of robbery, stated: "It is settled that the crime of robbery is not confined to the act of taking property from victims. The nature of the crime also is such that a robber's escape with his loot is just as important to the execution of the crime as obtaining possession of the loot. Thus, the crime of robbery is not complete until the robber has won his way to a place of temporary safety." (P. 1004.) (See also *In re Bryant,* 19 Cal.App.3d 933, 936 [97 Cal.Rptr. 40].)

Defendant and his accomplices were not safe with Buesen in their company and capable of alerting others that he was being victimized right then by those present. They had not won their way to "temporary safety" until they had left him at the construction site, bound and gagged.

Under the instructions as given in the instant case, the jury could not have found defendant guilty of kidnaping in violation of Penal Code section 207. If the prosecution had desired that the case be put to the jury on

the first mentioned option, it should have offered a proposed instruction that if the asportation was integral to the underlying crime of robbery, they could not find defendant guilty of kidnaping unless they found the asportation substantially increased the risk of harm to the victim over and above that normally incident to the underlying crime of robbery. The conviction on count I must be reversed and the case remanded for new trial.

## II

The victim identified defendant's photograph from a group of eight mug shots shown to him by the police at his place of employment on the Tuesday following the robbery. Defendant was in custody at the time. Defendant contends that he had a right to have counsel present at the time of this photographic identification. *People* v. *Lawrence,* 4 Cal.3d 273, 279-280 [93 Cal.Rptr. 204, 481 P.2d 212], holds to the contrary.

## III

▮ Prior to trial, defendant made a motion under *United States* v. *Wade* and *Gilbert* v. *California*[2] to suppress the photographic identification of defendant by Buesen. It was stipulated that the motion be submitted on a designated portion of the reporter's transcript of the preliminary hearing and the eight photographs which had been shown to Buesen. At the time of the trial Buesen was again questioned on the manner of the photographic identification. The problem can be delineated in this testimony without reference to the transcript of the preliminary hearing.

Buesen testified as follows: On the Tuesday following the robbery he identified defendant's photograph as depicting one of the participants in the robbery-kidnap from a group of eight mug shots. Sergeant R. D. Campbell came to Buesen's place of work to show him the photographs at about 11 a.m. The eight photographs were spread out on the table. Buesen walked in, saw defendant's photograph in the group of eight, picked it up, and threw it on top of a small file saying, "this was one of them." After Sergeant Campbell saw the picture Buesen was referring to, he said that the one Buesen had identified was a picture of one of the men the police had found driving Buesen's automobile. Campbell then said that a picture of the other man they had found in Buesen's car was also in the group of eight photographs, but Buesen was unable to identify anyone in the remaining pictures.

Defendant argues that the fact that the police told Buesen that they had

---

[2]*United States* v. *Wade*, 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Gilbert* v. *California*, 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951].

found defendant driving Buesen's car must have dispelled any doubts that Buesen had about defendant's identity. This argument might be more persuasive if Buesen had expressed doubts about defendant's identity. But he never did, neither at the time of the original photographic identification nor at the time of trial. The fact that Buesen was uninfluenced by the officer's statement is shown by the circumstance that Buesen said he could not identify any of the other photographs even after the officer had told him that the photograph of the other man the police had found in Buesen's car with defendant was in the group of eight.

## IV

Defendant contends that when one of the jurors announced, during the polling of the jury, that the jury was told it had to vote either guilty or not guilty on both counts collectively, rather than considering each count separately (see below), the trial court should have granted defendant's motion for a mistrial.

The relevant facts are as follows: When the jury returned with its verdicts, the jurors were polled. Each of the 12 jurors answered that the verdict on count I (robbery), was his verdict. The court then proceeded to have the jury polled on count II (kidnaping). The first six jurors answered that the verdict on that count was theirs. When the seventh juror, Mrs. Mildred H. Irving, was polled, the following occurred:

"MRS. IRVING: I am confused. I must ask a question. I thought it was— we had to find them all or nothing. This—I don't understand. This reading is different.

"THE COURT: The defendant, as well as the People, have a right to see how each one of you voted on the various counts.

"MRS. IRVING: We didn't vote on the various counts. We were told we couldn't vote on the various counts;[3] we could only vote on guilty or not guilty; that we didn't take them separately and vote on them.

"THE COURT: Mr. Morrissey [jury foreman], did you consider each one of the counts?

"MR. MORRISSEY: Yes, your Honor. And I pointed out to the members of the jury the necessity for the robbery to be committed with all parties pres-

[3]Apparently Mrs. Irving was giving her understanding of what the jury foreman had advised and was not making reference to any court instructions. The trial court had given CALJIC No. 17.02 (each count charges distinct offense which must be decided separately).

ent, and after my signing of these forms I passed them around to be purused [*sic*] by each and every juror.

"MRS. IRVING: But you didn't say we could vote on them individually. We voted on them—one thing, guilty or not guilty.

"THE COURT: Mrs. Irving, would you like to consider that particular vedict further?

"Do you wish to deliberate further on that, if this does not represent your thinking?

"MRS. IRVING: Well, I don't understand. Is there anybody else that's confused about this? Am I the only one, about the four different things that we were supposed to vote on?

"THE COURT: Mrs. Irving, might I suggest that in the light of whatever questions you may have that you discuss it with all of the jurors in the jury room and we will wait, and you take such time 'as you require, and if you have any questions then Mr. Morrissey will place those questions in written form and the Court will enlighten you further.

"Mr. Morrissey, will you proceed back into the jury room[.]"

Defendant contends that sending the jurors back for deliberation amounted to coercion of Mrs. Irving to reach a verdict which was not her own. However, there is nothing in the trial court's comments that indicate it was attempting to coerce Mrs. Irving's decision. Obviously its purpose was to allow Mrs. Irving to discuss whatever confusion existed in her mind with the other members of the jury. This procedure appears to be entirely appropriate under Penal Code section 1163.[4] Mrs. Irving, of course, did not say that the verdict (guilty) on count II was not hers; rather she indicated that she was confused with respect to whether each count was to be voted on separately. Although the trial court offered the jury further enlightenment, the jury never requested it, indicating Mrs. Irving's confusion was dispelled. The jury returned in 17 minutes, and when it was again polled, each juror, including Mrs. Irving, answered unequivocally that the verdict on count II was his.

The trial court did not abuse its discretion in determining that each of the jurors had finally assented to the verdict freely and voluntarily, and

---

[4]Penal Code section 1163 reads: "When a verdict is rendered, and before it is recorded, the jury may be polled, at the request of either party, in which case they must be severally asked whether it is their verdict, and if anyone answers in the negative, the jury must be sent out for further deliberation."

in refusing to grant a mistrial. (*People* v. *Mestas,* 253 Cal.App.2d 780, 787 [61 Cal.Rptr. 731]; *People* v. *Burnett,* 204 Cal.App.2d 453, 457, 458 [22 Cal.Rptr. 320].)

## V

■ A Mr. Isadore Swanson was in Buesen's car with defendant at the time of defendant's arrest. He was arrested also and spent some time in the same jail cell with defendant. Swanson was released when it was established that he had been hitchhiking, that defendant had picked him up shortly before the arrest, and that Swanson had had nothing to do with the robbery-kidnaping. After his release, Swanson told Officer Campbell that defendant had taken a wrapper off a roll of nickels he had in his possession and had flushed it down the toilet in the holding cell and that defendant had given some paper money to another man in the cell. Swanson denied this conversation on direct testimony. Officer Campbell then took the stand and testified as set out above. Defense counsel did not object to this testimony. Defendant now contends it was inadmissible hearsay. However, the evidence was properly introduced as impeachment of Swanson's direct testimony under Evidence Code section 1235 and as substantive evidence. (*California* v. *Green,* 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930]; *People* v. *Green,* 3 Cal.3d 981, 989-990 [92 Cal.Rptr. 494, 479 P.2d 998].)

## VI

■ During the course of the trial defendant attempted to impeach Buesen's testimony and in particular his identification of defendant by showing that Buesen had given a description of the three robbers to the police immediately after the incident different than he had given on the stand. Defense counsel extensively cross-examined Buesen on this subject. Buesen stuck firmly to his in-court testimony, indicating at one point that the officer in writing up his police report had confused the various positions of the three suspects in the car. Defense counsel later called Officer Stephen C. Linger, the man who had prepared the robbery report, as defendant's witness. Officer Linger testified to statements made by Buesen from which he had prepared the report. When counsel thereafter moved to introduce the robbery report itself in evidence, an objection by the prosecutor was sustained by the trial court.

The robbery report was cumulative, the subject having been thoroughly covered by Officer Linger. On that ground it was properly excluded by the trial court. (*Fuentes* v. *Tucker,* 31 Cal.2d 1, 7 [187 P.2d 752]; *Douillard*

**382**

v. *Woodd,* 20 Cal.2d 665, 669 [128 P.2d 6]; *People* v. *Vaughn,* 262 Cal. App.2d 42, 48-49 [68 Cal.Rptr. 366].)

## VII

The information in the instant case contains an allegation in count I charging defendant as follows: "That at the time of the commission of the above offense [robbery, in violation of Penal Code, section 211] said defendant was armed with a deadly weapon, to wit, a .38 caliber revolver, within the meaning of Penal Code Section 12022.5." In a printed verdict form the following finding was made by the jury: "We, the Jury . . . find the charge against the Defendant . . . of being armed at the time of the commission of the offense within the meaning of Penal Code 12022.5 as contained in Count I of the Information true."

The judgment incorporated this finding as ". . . armed allegation having been found true within the meaning of Penal Code Section 12022.5, . . ."

The pertinent part of section 12022.5 provides: "Any person who *uses* a firearm in the commission . . . of a robbery . . . ." (Italics added.)

The trial judge read the information to the prospective jurors before the actual jury which decided this case was impaneled. However, the jury was never instructed that a specific element of section 12022.5 was the *use* of a firearm. Rather the instructions given were in the general terms of Penal Code section 12022, to wit: "armed with a deadly weapon." (CALJIC No. 17.15)[5]

Accordingly, under the authority of *People* v. *Spencer,* 22 Cal.App.3d 786, 801-802 [99 Cal.Rptr. 681], and *People* v. *Washington,* 17 Cal. App.3d 470, 474-477 [94 Cal.Rptr. 882], we hold that, because the jury was inadequately instructed, Penal Code section 12022.5 cannot be made applicable under the existing verdict. Since we must remand this case for retrial on count II, we remand as to count I as well with directions that a specific finding be made on the issue of use under Penal Code section 12022.5.

[5]"It is charged [in Count I] that at the time of the commission of the offense therein described, the defendant . . . was armed with a deadly weapon, to wit, a .38 caliber revolver.

"If you find the defendant guilty of the crime thus charged [in Count I], it then will become your duty to determine whether or not he was armed with a deadly weapon at the time of the commission of the offense, and you will include a finding on that question in your verdict, using a form that will be supplied for that purpose."

Judgment of conviction of Penal Code section 211 on count I is affirmed; but the adjudication "as to" Penal Code section 12022.5 is reversed and the matter is remanded with directions as set out above.

Judgment of conviction on count II is reversed and remanded for new trial.

Kaus, P. J., and Aiso, J., concurred.

A petition for a rehearing was denied May 31, 1972, and respondent's petition for a hearing by the Supreme Court was denied July 5, 1972.