[Crim. No. 27889. Second Dist., Div. Five. Dec. 3, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
EUGENE EVANS SIMS, Defendant and Appellant.

**548**

COUNSEL

Paul Arthur Turner, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Carol Wendelin Pollack, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**HASTINGS, J.**—In a jury trial the defendant Eugene Sims was convicted of rape in violation of Penal Code section 261, subdivision 3 and kidnaping in violation of Penal Code section 207. Probation was denied and as to each count defendant was sentenced to the state prison for the term prescribed by law; the sentence as to Count II was stayed pending appeal, said stay to become permanent upon a judgment affirming the conviction. Defendant has appealed from the judgment.

A pretrial hearing was held pursuant to Evidence Code section 402 to determine the admissibility of a voice identification of defendant by the victim. The evidence adduced therein is as follows: Sharon S., the victim, stepped behind a screen in the courtroom and closed her eyes. Six different men, including defendant, then read seven statements that had been made by the assailant. At first Sharon could not recognize any of the voices because it was "too confusing." Upon examination she said that the persons identified as numbers one and six were definitely not the assailant and that the voice that "sounded close" was number four (defendant's voice). She did not have any particular reaction to voices two, three and five.

At the trial, Sharon, an employee of the Antelope Valley Hospital Medical Center, testified that on March 27, 1975, she got off duty at the hospital at 12:15 a.m., and as she was walking to her car to go home she noticed a light colored station wagon parked nearby. The man standing by the station wagon said to her, "Do you know this guy?" and started walking towards her. The man then repeated the question and grabbed her by the throat as she turned to run away. She could not see all of his

face because he had "a piece of cloth" draped on his head. He told her not to move or he would "rip [her] tonsils out." He then put his fingers in her mouth, shoving her jaw downward, and forced her to walk behind a small wall where he forced her to the ground. He questioned her about money and told her to "shut up" everytime she asked him not to hurt her. He also told her that she "must really love" herself. She was then blindfolded, her hands were tied behind her back, and she was forced to walk around in circles in a squatting position before he walked her to his car. He placed her inside his car, retied her hands, tied her legs and went through her purse. After they drove for about 10 or 15 minutes, the car stopped and the man said, "I am going to ball you now." During the ride she noticed that the car heater was "very noisy" and the car smelled greasy and oily. She recalled that the man smoked a lot and he played the radio very loudly. She was forced into the rear of the car onto a mattress where he forced her to have sexual intercourse. After completing the act he placed a quilt over her body when she told him she was cold. Subsequently, there was a second act of intercourse. While still blindfolded she felt the stuffing coming out of a rip in the front seat of the car. He then drove her back to an area close to the hospital and released her. She walked to the hospital and was examined by a Dr. DeTrana.

Between 5:45 a.m. and 6:15 a.m., on March 27, Sharon returned with several deputies to the area where she was originally accosted. Deputy Jelletich examined the footprints in the area and saw that Sharon's shoe left a print similar to other footprints in the area. (She was wearing the same shoes as when she had been assaulted.) Footprints paralleling Sharon's prints appeared to form a man's plain soled shoe with a hobnail heel. The wind was blowing and there was not enough time to preserve the prints so that a plaster mold could have been made.

Defendant was arrested April 5. On April 7 and 8, Sharon accompanied various deputies to a "tow lot." When they first pulled into the lot she asked if the station wagon (defendant's automobile) was the car she was supposed to examined because it was similar to the car she had seen the evening she was attacked. On closer examination the car appeared to her to have the same greasy and oily odor. The car also had stuffing exposed as did the car in which she was sexually assaulted; the heater made the same noise, the ash tray was full of cigarette butts, and there was a quilt in the car that felt similar to the one that had been placed over her body, however, there was no mattress in the back seat.

Deputy Baker dusted the interior of the station wagon for prints but could find none.

Lucille Chiles lives across the street from defendant's sister. Defendant had been living at his sister's home from February of 1975, until the date of his arrest. Mrs. Chiles testified that defendant's car was often parked near her house. She also stated that on March 30, 1975, she saw a small mattress set out next to the trash cans across the street from her house. The next day was Monday, the 31st, a trash pickup day. The mattress was small enough to have fit in the back of a station wagon.

On April 14, Deputy Jelletich took a pair of defendant's shoes to the area where Sharon was first grabbed by the assailant. He made imprints in the dirt and concluded that defendant's shoes were the same shoes that had made the prints he had seen on March 27.

Glenda Young had known defendant for approximately seven to eight years. She testified that she had seen a mattress in the back of his station wagon in March. On April 10, defendant telephoned her and said that "it would sure help out" if she could say that he had been at her house the evening of the 26-27th. She told him that she could not remember whether he had been there or not and was not going to say he had been there. At trial she stated that she knew "distinctly" he was not there on the night of the 26th from 11 until "whatever time that was on the 27th" that the offense occurred.

Donald Nay, defendant's cousin, testified that he had been in defendant's car and knew that its heater was very noisy. One night near March 27, he was riding with defendant in defendant's car near the hospital when defendant said that the nurses get off their shift around 11:30 and they would be walking home so "it would be a good place to pick up a couple of girls."[1] He denied that the defendant had used the word "grab." Nay also said that he had seen a mattress in defendant's car but never was in the car when the mattress was in it.

At trial defendant read seven statements made by the assailant. Sharon testified that there was no question in her mind that his voice was the voice of her attacker. She admitted before the jury that she did not conclusively and positively identify defendant's voice at the pretrial

---

[1] Deputy Dilks testified that he interviewed Nay on April 5. At that time, Nay stated that it would be "easy to grab a girl" at the convalescent hospital.

hearing. She said that defendant's voice sounded "familiar" at the pretrial hearing, but that at the trial she was able to identify his voice "conclusively and positively." The trial was her first opportunity to hear defendant's voice alone. She could not identify defendant visually. Sharon also faced the wall while she listened to a "jingling" sound (that of defendant's belt buckle). She identified it as the sound she had heard as she was walking from the car just prior to her release.

Defendant's brothers, Curtis Sims and Dueal Sims, also read the seven statements to Sharon while she had her eyes closed. She stated that neither of the voices sounded similar to her assailant's voice.

Testifying on behalf of defendant, Bonnie Lawrence stated that on the evening of the incident defendant arrived at her home in Palmdale at about 12:20 a.m., and left after about an hour.

Nadine Chapman, defendant's sister, testified that at 1:50 a.m., on the morning of the 27th, defendant woke her up and asked her to let him into the house. He spent the rest of the night in her home.

Defendant contends that the prosecutor committed prejudicial misconduct by referring to him as the assailant during the trial on at least five separate occasions.[2] From the record it does not appear that there was any bad faith or moral dishonesty by the prosecutor. He referred to defendant in his questioning inadvertently and, afterwards, made a substantial effort to change his terminology while questioning the

---

[2]During direct examination of Sharon by the prosecutor, the following ensued:

"Q At the time that the defendant was performing—strike that." Defendant's request for a mistrial was denied and the word "defendant" was stricken from the question.

"Q What was the defendant's body position in relationship to yours?" Defendant's objection to the use of the word "defendant" was sustained and any reference to defendant was stricken. The prosecutor then replied, "Thank you. I just wrote it down on my legal pad so I won't forget. I apologize."

A short time later the prosecutor asked, "Were there times during this act of intercourse that the defendant's body was not directly between you?" The court corrected him and the prosecutor apologized.

Shortly thereafter he stated, "You also indicated at a certain point in time the defendant's body—" The motion for mistrial was again denied and the jury was "strongly admonished to disregard the reference made by counsel in that regard."

Later, in his examination, the prosecutor asked, "Had you asked the defendant where he was taking you, anything like that?" Defense counsel objected, the prosecutor apologized and stated, "I do intend to connect it up at a later time during these proceedings and I do apologize for using the word 'defendant' but we will get there, your Honor."

The court again admonished the jury.

victim. ■ Clearly, the prosecutor was not attempting to persuade the jury by deceptive or reprehensible means. (See *People* v. *Meneley,* 29 Cal.App.3d 41, 62 [105 Cal.Rptr. 432]; *People* v. *Helfend,* 1 Cal.App.3d 873, 884 [82 Cal.Rptr. 295].) In any event, the court's admonitions were entirely adequate. (*People* v. *Perez,* 58 Cal.2d 229, 247 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946]; *People* v. *Lyons,* 50 Cal.2d 245, 262 [324 P.2d 556].)

Defendant contends that the victim's identification of his voice as that of her assailant was based on a procedure which was "impermissibly suggestive." Defendant specifically does not object to the pretrial identification where Sharon heard the voices of six different men. Rather, he urges that "[t]he inadmissible testimony was that resulting from the event occurring in court when [defendant] had to read the phrases by himself and in full view of [Sharon]." This contention is without merit.

■ It is well settled that the privilege against self-incrimination "offers no protection against compulsion to submit to fingerprinting, photographing or measurements, *to write or speak for identification,* to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture." (Italics added.) (*Schmerber* v. *California,* 384 U.S. 757, 764 [16 L.Ed.2d 908, 916, 86 S.Ct. 1826]; *People* v. *Holt,* 28 Cal.App.3d 343, 350-351 [104 Cal.Rptr. 572]; overruled on other grounds in *Evans* v. *Superior Court,* 11 Cal.3d 617, 625 [114 Cal.Rptr. 121, 522 P.2d 681]; *People* v. *Hess,* 10 Cal.App.3d 1071, 1076-1077 [90 Cal.Rptr. 268, 43 A.L.R.3d 643].) Forced exhibition of "real or physical" evidence, such as of a physical characteristic, does not constitute a fundamental unfairness which is a violation of due process, and the voice "is merely another identifying physical characteristic." (*People* v. *Ellis,* 65 Cal.2d 529, 535 [55 Cal.Rptr. 385, 421 P.2d 393].) There was nothing improper about the trial identification procedure.

Defendant also complains that prior to the identification procedure at trial, Sharon was told by the prosecutor that she had identified defendant's voice at the pretrial hearing and was informed by several sheriff's deputies that they believed that defendant "was the one" who raped her. ■ The jury, however, was made fully aware of this evidence and it was thus able to evaluate the strength of her positive trial voice identification on the basis of these factors. Such evidence would affect the weight rather than the admissibility of the identification. (Cf.

*People* v. *Greene*, 34 Cal.App.3d 622, 646 [110 Cal.Rptr. 160]; *People* v. *Padgitt*, 264 Cal.App.2d 443, 448-449 [70 Cal.Rptr. 345].)

Moreover, Sharon testified on voir dire outside the presence of the jury that the prosecutor's information had had no effect on her identification of defendant's voice and would not change her opinion as to whether or not she could identify defendant's voice at the trial. As to her being influenced that defendant was the assailant by the deputies' belief, there is nothing in the record to suggest that she identified defendant's voice based on their opinion rather than on her own beliefs. At the trial she unequivocally identified defendant's voice. Later, she definitely excluded the voices of defendant's two brothers. At the pretrial hearing defendant's voice was the one which sounded "familiar," explaining that the identification procedure was "too confusing." Under these circumstances it cannot be said that her in-court voice identification was tainted. There was no denial of due process. (See *People* v. *Henderson*, 25 Cal.App.3d 371, 378-379 [101 Cal.Rptr. 129]; overruled on other grounds in *In re Earley*, 14 Cal.3d 122, 130, fn. 11 [120 Cal.Rptr. 881, 534 P.2d 721].)

■ Defendant argues that the trial court erred in failing to allow defense counsel to cross-examine Sharon as to whether she had had a pregnancy test within two weeks prior to the rape. (It is to be noted that this question was not asked on cross-examination but on direct examination when Sharon was called as a defense witness.)

Earlier defense counsel had asked Sharon if she had had sexual intercourse with any person in the two-day period prior to the incident. She replied that she had. Defense counsel then asked her about the pregnancy test and the prosecutor's objection to this line of questioning was sustained by the trial court. Defense counsel made an oral offer of proof to the effect that such evidence was relevant because Sharon may have known that she was pregnant and thus "concocted" the story of rape to cover up for her pregnancy.

Under Evidence Code section 782 the admission of evidence of sexual conduct of the alleged victim of a rape offered to attack her credibility is procedurally limited. Section 782 requires that the testimony be preceded by a written motion by the defendant accompanied by an affidavit containing an offer of proof. If the trial court finds that the offer of proof is "sufficient," it must conduct a hearing out of the presence of the jury

and allow the alleged victim to be questioned " 'regarding the offer of proof . . . . At the conclusion of the hearing, if the court finds that evidence proposed to be offered by the defendant regarding the sexual conduct of the complaining witness is relevant . . . and is not inadmissible pursuant to Section 352 of [the Evidence Code], the court may make an order stating what evidence may be introduced by the defendant, and the nature of questions to be permitted. The defendant may then offer evidence pursuant to the order of the court.' " (See *People v. Blackburn,* 56 Cal.App.3d 685, 691 [128 Cal.Rptr. 864].) In the present case defendant did not file an affidavit or written motion as required by section 782. Consequently, he may not now complain of error.

Defendant also contends that his motion for a mistrial should have been granted because the prosecutor engaged in misconduct by asking a question designed to elicit inadmissible testimony.

During the direct examination Glenda Young testified as follows:

"Q [DEPUTY DISTRICT ATTORNEY] Whose car is that? [Referring to photographs of an automobile depicted in People's Exhibits 2-11.]

"A Gene Sims [defendant] . . . .

"Q Do you know when he got that car?

"A Sometime before he got out of jail this last time. That is all I know."

Defendant argues that such testimony was highly prejudicial and, further, that the prosecutor's request for an admonition that the jury disregard the testimony should not have been granted because it "further emphasize[d] to the jury the fact that he has been arrested before."

It is true that a prosecutor may not intentionally elicit inadmissible testimony. ■ However, in the present case, the record does not show that the prosecutor expected to elicit the testimony that defendant had previously been in jail. Prior to trial the prosecutor "warned" Glenda Young not to mention that defendant had been "in . . . or out of jail." His question as to when defendant acquired his car was merely to establish that defendant had owned the car before the rape. He was totally surprised that Glenda Young had "blurted that out" and he had

no control over what the witness was going to say. There is no evidence of bad faith on the part of the prosecutor. Contrary to defendant's argument, the admonishment was proper. If it had not been given, the jury would not have known that it was improper to consider evidence of a former arrest. It must be presumed that the jury followed this instruction. (*People* v. *Bryson*, 257 Cal.App.2d 201, 209 [64 Cal.Rptr. 706].) There was no denial of a fair trial.

Defendant additionally contends that the jury was improperly instructed as to defendant's admission to Nay. At trial Donald Nay, defendant's cousin, testified that defendant had told him that the hospital "would be a good place to pick up a couple of girls." Nay denied that defendant had used the word "grab" and denied telling the deputies that defendant had said "grab."

Later Deputy Dilks testified that Nay had told him defendant had said "it would be easy to grab a girl at the convalescent hospital. . . ." No cautionary instructions were given regarding defendant's admissions to Nay.

■ A trial court is under a duty to instruct a jury *sua sponte* that evidence of a defendant's oral admissions must be viewed with caution. (*People* v. *Beagle*, 6 Cal.3d 441, 455 [99 Cal.Rptr. 313, 492 P.2d 1].) However, "[t]he omission of such instructions does not constitute reversible error in every instance. Reversal is justified only if upon a reweighing of the evidence it appears reasonably probable that a result more favorable to the defendant would have been reached in the absence of error. (*People* v. *Beagle, supra,* 6 Cal.3d 441, 455.) The circumstances of each case must be examined to determine whether a failure to give cautionary instructions constitutes reversible error." (*People* v. *Lopez*, 47 Cal.App.3d 8, 13 [120 Cal.Rptr. 562].) Here, the evidence was merely cumulative to other identification evidence. From the record, we cannot say that a different verdict would have been probable had the cautionary instructions been given. (*People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243]; cf. *People* v. *Lopez, supra,* 47 Cal.App.3d 8, 14.)

■ Defendant also contends that the trial court should have instructed the jury *sua sponte* that Nay's prior inconsistent statement should be viewed with caution. He asserts that such an instruction was required in that the reasons underlying the general rule that a court must instruct

that oral admissions of a party are to be viewed with caution, ought to be equally applicable to prior inconsistent statements which are admissible under Evidence Code section 1235. This contention is without merit. A cautionary instruction is applicable only where the purpose of the testimony is to introduce *a party's* oral admission. (*People* v. *Ford*, 60 Cal.2d 772, 799 [36 Cal.Rptr. 620, 388 P.2d 892].) Nay was not a party defendant to this action. Further, Nay's prior inconsistent statement cannot be considered an admission as to himself; it was admissible to ascertain the specific words Nay had used in his conversation with Dilks and to impeach Nay's previous testimony.

He also argues that in the present case, evidence of the prior inconsistent statement was admissible not only to impeach credibility, but also to prove the truth of the matter asserted in the inconsistent statement (i.e., to prove that defendant had said he could "grab" girls by the hospital). (See *People* v. *Green*, 3 Cal.3d 981, 985 [92 Cal.Rptr. 494, 479 P.2d 998].) This argument, however, is merely a continuation of his last contention that the trial court should have given the basic cautionary instruction to the effect that oral admissions of a party should be viewed with caution. Thus, even were it assumed that failure to give a cautionary instruction regarding defendant's admissions contained in Nay's extrajudicial statements was error, such error, for the reasons stated in the preceding argument, was nonprejudicial.

The judgment is affirmed.

Kaus, P. J., and Ashby, J., concurred.

A petition for a rehearing was denied December 30, 1976, and appellant's petition for a hearing by the Supreme Court was denied February 3, 1977.