Filed 7/26/16  P. v. Aldana CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RICARDO ALDANA,<br><br>    Defendant and Appellant. | G051024<br><br>(Super. Ct. No. 12HF0258)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, David A. Hoffer, Judge.  Affirmed.

Erica Gambale for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorney General, for Plaintiff and Respondent.

\*        \*        \*

A jury convicted Ricardo Aldana of three counts of lewd acts with a child (Pen. Code, § 288, subd. (c)(1)). The court imposed a sentence of three years and four months. Aldana argues three of the court's evidentiary rulings violated state law and his constitutional right to a fair trial. We reject his arguments and affirm the judgment.

**FACTS**

In the late 2000's, Gabriella R.'s parents, Susan and Todd R., were in the midst of a contentious divorce. Gabriella lived with her mother and sister in a house in a gated community, but she seemed to be struggling.

In 2009, Gabriella told her middle school teacher her cousin sexually "abuse[d]" and "molest[ed]" her when the cousins were about five years old. A social worker questioned Gabriella about the incident and prepared a report, but no action was taken. Gabriella also reported Todd to social services for physical abuse, but the report was deemed unfounded.

In the fall of 2010, Gabriella entered a local Catholic high school as a 13-year-old freshman. Aldana was then a 37-year-old soccer coach and Spanish teacher at the school. Aldana was a popular teacher, and Gabriella developed a crush on him.

In December 2011, Gabriella, with Susan's support, accused Aldana of molesting her. Gabriella met with Orange County Sheriff's Detective Margie Sheehan, and she submitted to an interview with the Child Abuse Services Team (CAST).

*Gabriella's Statement & Testimony*

According to Gabriella, Aldana paid attention to her during her freshman year. He touched her shoulders, gave her neck massages, and told her to come to his classroom after school if she ever needed help. Gabriella described Aldana as very "friend[ly]" and "touchy" with everyone, but she also said the fact Aldana touched her and sometimes massaged her back led her to believe he might be "hitting on [her]."

Around April 2011, Gabriella told her close friend, Bridget K., and an adult neighbor and mentor, Nazanin Houshyar, that she had an older boyfriend. Gabriella

2

texted Houshyar about the relationship almost every day, and she referred to her boyfriend as "Pollito."

Gabriella said she occasionally skipped her first period class to be with Aldana in his classroom, and she often waited for her mother in his classroom after school. On one occasion, Gabriella waited alone in Aldana's classroom for her mother until 7:00 p.m. Gabriella also once wrote Aldana's name on her arm. When Aldana saw it, Gabriella said to him, "I guess I belong to you." Aldana responded, "tell me when I can have you on the weekend sometime."

A few days before the end of the school year, Aldana asked Gabriella to help him grade papers, and he bought pizza for them to eat in his classroom. Aldana told Gabriella she was the "perfect girlfriend for the perfect guy." They exchanged phone numbers, and Gabriella texted Aldana, "have a nice summer."

During the summer, Aldana and Gabriella exchanged numerous texts. One night, Gabriella was visiting Bridget when Aldana sent a text and asked her if she had ever kissed a girl. When Gabriella said she had, Aldana asked if the girl was Bridget.

On another occasion, Aldana texted Gabriella and asked if she wanted to "meet up." After an exchange of texts, Aldana made a 2:00 a.m. phone call to Gabriella. Gabriella said Aldana sounded panicky, and possibly drunk or high. He asked her if she wanted to make love to him, and if she would be his 14-year-old girlfriend. They talked for about two hours. Aldana repeatedly asked to see her, but Gabriella told him, "I can't meet up. I have a house alarm, and I'm in the house with . . . mom, and I can't leave."

In the fall of 2011, 14-year-old Gabriella switched to the home-schooling program. Nevertheless, one day in September, Gabriella donned her old school uniform and went to Aldana's classroom. She did not check in at the school office. She did, however, spend a couple of hours in Aldana's classroom, and Bridget saw her with him.

On September 10, Susan left Gabriella at home alone while she went on an overnight trip. Gabriella said she was alone and wanted to go out with Aldana. Aldana

3

agreed.  He offered to pick her up, and Gabriella suggested a nearby middle school outside her gated community as a meeting place.  Gabriella texted Houshyar, and told her what she wanted to do.  Houshyar expressed concern and advised Gabriella to be safe.

Gabriella said Aldana picked her up sometime after 10:00 p.m.  After driving around for sometime, he took her to his home.  Aldana parked his car and asked Gabriella to wait while he checked to see if his roommates were asleep.  While Gabriella waited in Aldana's car, she sent another text to Houshyar.

When Aldana returned, he walked Gabriella through the house and into his bedroom.  Gabriella said she saw a surfboard in a courtyard.  She also told Sheehan there were cologne bottles and a flat screen television sitting on top of Aldana's dresser, and he had a lighted air freshener.

Gabriella said they sat on his bed and talked.  They kissed, and Aldana put his hands on Gabriella's breasts and buttocks over and under her clothes.  Within moments, Aldana was removing Gabriella's clothes, and his own.  When Aldana took off his shirt, Gabriella saw a sun tattoo on his right shoulder.

During the next couple of hours, Gabriella and Aldana engaged in oral, anal, and vaginal intercourse.  When Aldana started vaginal intercourse, Gabriella expressed fear over getting pregnant.  Aldana quickly reached for his pants and produced a condom.  After about 10 minutes of vaginal intercourse, Aldana turned Gabriella over on to her stomach and penetrated her anus.  Minutes later, Aldana turned Gabriella over, penetrated her vagina, and ejaculated.

Afterward, Gabriella, again, expressed concern over a possible pregnancy.  Aldana told her, "you don't say that to guys after—after sex."  They fell into a light sleep, but Aldana woke Gabriella before 4:00 a.m. so he could get her out of the house before his early-rising roommates.

Aldana drove Gabriella home, but he parked down the hill from the entrance to her gated community.  They sat in his car and kissed for a couple of hours.

4

At around 7:00 a.m., Gabrielle waived to the security guard and Aldana drove through the gate. When Gabriella got home, she immediately texted Houshyar and said she had sex with a man. She told Bridget about it two days later.

In October, the principal of Gabriella's home school, Kristin Soto (Soto), noticed Gabriella was not concentrating in school, and she was becoming withdrawn and aggressive. After a few of Soto's questions, Gabriella admitted having sexual intercourse with a teacher at her former high school, but Gabriella refused to give a name. Soto twice contacted Child Protective Services to report what Gabriella alleged, but Child Protective Services would not act on the information without a name. Soto also met with Gabriella and Susan, but Gabriella refused to give them a name.

At the end of November 2011, Gabriella went to a camp in Colorado. She told her counselors and other campers about her sexual experience with Aldana. One of the counselors advised Gabriella to call her mother and tell her the truth. Gabriella complied. By the time Gabriella returned from camp, her mother had hired a civil lawyer and contacted the Orange County Sheriff's Department.

Gabriella said Aldana frequently warned her about what would happen if anyone found out about their relationship: "He was telling me, you know, I'll go to jail. And sometimes he would be like, I'll take you with me and we'll run away but then no because that would be a manhunt. And it was just down the line of things—oh, something about his parents. He said he pays for his parents and if he goes to jail that they're not going to have anywhere to live because he pays for their housing."

*Covert Phone Call*

During a recorded, covert phone call with Aldana, Gabriella asked if he had sex with another girl, or if she was the only one. Aldana said he "didn't have sex with anybody." Aldana told Gabriella they "were friends." He complained about the trouble Gabriella's mother was causing him, and he threatened to leave the state, because his life was over.

5

When Gabriella told Aldana he took her virginity, Aldana replied, "I'm excuse me but, um you know, I'm . . . what happened to me . . . as far as like things, you know." When Gabriella said that she had repeatedly lied for Aldana about their relationship, he responded, "Okay, okay, do you, do you remember when you were approaching me and when I would say no, no, no, no, no, no; remember that?"

Gabriella mentioned that the police would be able to retrieve her phone records, including the texts they had exchanged. Aldana denied texting Gabriella. After Gabriella said, "we made love, for God's sakes," and she asked if it meant anything to Aldana. He replied, "You know what, um, there's . . . when we talk to each other you, you have no idea, you know, um, how much it meant; okay. Alright . . . you have no idea." Gabriella also expressed concern that she might have gotten a sexually transmitted disease from Aldana. Aldana responded, "what the hell. Do I have anything to worry about as far as you?" He also told her there was no evidence they had a sexual relationship, and he begged Gabriella not to say anything.

While the conversation transpired, Sheehan had two sheriff's deputies stationed outside of Aldana's home to watch him. They described Aldana as "visibly shaken." He paced and appeared to be involved in an "intense conversation." When the call ended, a car pulled up in front of Aldana's house. He walked out of his home, got into the car, and drove away, but Sheriff's deputies quickly stopped the car and arrested him.

*Aldana's Statement*

After being *Mirandized* (*Miranda v. Arizona* (1966) 384 U.S. 436), Aldana told the officers he did not know why he had been arrested. He said the high school had investigated Gabriella's claims, and he had been reinstated. Police asked about phone calls and texts to Gabriella. Aldana said he had changed his phone number, "because of everything that was going on," so he did not understand how Gabriella had been able to

6

call him. Aldana complained because Gabriella had started saying "certain things" about him, and he felt threatened by her.

Sheehan advised Aldana that she had his phone records, and she assured him Gabriella had already admitted her willing participation. Aldana said, "I never had intercourse with, with this girl . . . ." When Sheehan asked Aldana about "September 10, 2011," Aldana said Gabriella had come to his door at 3:00 a.m. She said she was afraid for her life. He offered to call the police, but Gabriella just wanted a ride home. Aldana took her home about 10 to 15 minutes after her arrival.

Sheehan told Aldana they had evidence he brought Gabriella back into her gated community in the early morning hours of September 11. Sheehan also said she had text messages. Aldana denied taking Gabriella home on September 11, or sending her texts.

When pointedly questioned, Aldana denied having oral, anal, and vaginal sex with Gabriella. He denied Gabriella had ever been inside his home, let alone his bedroom. He denied touching her or "anything sexual." Aldana considered himself to be Gabriella's mentor.

Aldana also told Sheehan he had received an anonymous letter that accused him of having sex with Gabriella, but he did not understand it. Furthermore, Susan had threatened to send Gabriella to boarding schools, which made Gabriella fearful and suicidal. Although Aldana admitted telling Gabriella that he loved her, he clarified that he loved "her as a person as a human being . . . ."

*Investigation*

Police searched Aldana's house and photographed his bedroom. They found a surfboard propped up in his courtyard. In Aldana's bedroom, deputies found a dresser with cologne bottles and a flat screen television sitting on top, and a lighted air freshener.

7

The People obtained Aldana's and Gabriella's phone records. Between June 3 and September 27, Aldana called Gabriella's number 14 times, and he sent 232 texts. Gabriella called Aldana 18 times and she sent 353 text messages.

On June 10, Aldana and Gabriella exchanged 325 text messages, with 148 texts originating from Aldana's phone. On June 11, at 2:23 a.m., Aldana called Gabriella and the call lasted 20 minutes. He called back a few minutes later, and the call lasted for 50 minutes. At 9:41 a.m., Gabriella called Aldana and talked for about three minutes.

On September 10, Gabriella called Aldana at 9:09 p.m., 10:07 p.m., and 10:09 p.m., and she sent two texts, one at 9:10 p.m., and the other at 9:16 p.m. At 10:16 p.m., Aldana called Gabriella, and the call lasted a little over two hours.

Between September 30 and November 12, Aldana made 23 phone calls and sent 28 text messages to Gabriella. During October and November, Gabriella called Aldana 30 times and sent 49 texts.

*Witness Testimony*

Bridget testified she met Gabriella in middle school, and they were classmates and close friends freshman year of high school. Gabriella frequently spent the night at Bridget's house. Bridget noticed that Gabriella talked about Aldana and spent a lot of time with him. Bridget saw some of the text messages Gabriella received. During one phone call, Gabriella said Aldana wanted to know if Bridget and Gabriella had a sexual relationship. The "emotional intimacy" between Gabriella and Aldana made Bridget uncomfortable.

Bridget remembered when Gabriella came back to her school in her old uniform. Bridget caught them "standing very close together alone in an empty classroom." Aldana gave Bridget a "look that was very frightening to [her]."

Gabriella told Bridget about her sexual experience with Aldana a couple of days after the fact. Gabriella told her Aldana had picked her up outside her gated community. He drove her to his house, and snuck her past his roommates. When they

8

sat on Aldana's bed, they kissed and removed their clothes. Gabriella told Bridget they had engaged in oral, vaginal, and anal intercourse, and she described a tattoo on Aldana's arm. Gabriella said they used protection, but she was afraid. They ended up at a CVS store near Gabriella's house and debated whether to buy a pregnancy kit.

Bridget and Gabriella told Bridget's aunt, Mary K., about the possibility of pregnancy. Mary assured Gabriella she could not be pregnant. However, Mary also looked at the high school's Web site and concluded Gabriella was talking about Aldana. She wrote an anonymous letter to him accusing him of molestation.

Houshyar believed Gabriella was "traumatized" by her parents' divorce. Gabriella confided in Houshyar that she felt like she was the mother in her family. Gabriella often said she was running away from home, and Gabriella once jumped from a moving car. Houshyar said Gabriella was "just not okay" during the divorce, and Houshyar knew Gabriella once accused her father of hitting her.

Houshyar knew Gabriella had a crush on Aldana, and that she stayed in Aldana's classroom after school. She had also noticed a pattern of behavior with Gabriella involving older men. Gabriella once texted Houshyar and said her older, married, karate teacher had a crush on her, and she believed other teachers had crushes on her. On September 10, Gabriella sent over 150 texts to Houshyar. In the texts, Gabriella advised Houshyar that "Pollito" was picking her up. Then, in the early hours of September 11, Gabriella texted, "I did it," and the sex was "beautiful." Although Houshyar "thought it was stuff [Gabriella] was imagining," she also contacted Susan.

Susan noticed something unusual in Aldana's relationship with Gabriella. For instance, Gabriella had once asked Susan for permission to go to the movies with him. Susan also knew Gabriella had Aldana's phone number. She said one of her "red flags" had been a suspicious phone call she witnessed between Gabriella and another person.

9

Eric Stroupe, a school administrator, contacted the Diocese of Orange (Diocese) for directions on how to proceed with Gabriella's accusations. The Diocese recommended placing Aldana on paid administrative leave during the investigation. Stroupe interviewed Aldana. Aldana said he had last seen Gabriella at school in September 2011. He admitted offering to tutor Gabriella in Spanish, but he denied making phone contact with her.

Stroup said he wanted to interview Gabriella and Susan, but Susan would not permit it. Because Gabriella and Susan did not cooperate with the Diocese's interview request, Stroupe advised the school to reinstate Aldana, and he informed Susan of his decision.

M.Z. met Aldana in 1996 when she was 16 years old, and he was her 21-year-old soccer coach. They became friends, but within about six months, the relationship became sexual. M.Z. lied to her mother and said she was going on a field trip the first time they had intercourse. M.Z. and Aldana married two years later, but there was an "ugly" divorce in 2001. M.Z. never told her parents that Aldana had sex with her before marriage.

*Defense*

Madison C., a friend of Bridget's, testified that after Aldana's arrest, Bridget said Gabriella had "start[ed] to tell some crazy stories" about Aldana, and her stories "keep changing." She also testified that Bridget said Gabriella claimed to go to Aldana's house for dinner and intercourse when her mother was out, and Bridget feared talking to the police because it would hurt Gabriella.

Lindsay Journo the vice-principal of academics at Gabriella's home school testified that she told Child Protective Services Gabriella "has a history of fabricating things and pushing the envelope." Todd, Gabriella's father, denied physically abusing Gabriella, and one of Aldana's former students testified he saw Gabriella in Aldana's classroom "once in awhile," and Aldana used scantron sheets for testing.

10

## STANDARD OF REVIEW

We review a trial court's evidentiary rulings under the abuse of discretion standard. (*People v. Avila* (2006) 38 Cal.4th 491, 578.) The court abuses its discretion by acting "in an arbitrary, capricious, or patently absurd manner that result[s] in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10; see also Evid. Code, §§ 353, 354 [erroneous exclusion, or admission, of evidence must result in a "miscarriage of justice" to justify reversal of the judgment].)

Evidentiary error is analyzed under the standard set out in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), which provides for reversal only when "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." Due process is violated only when the error causes a fundamentally unfair trial. (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

## DISCUSSION

Aldana challenges three of the court's evidentiary rulings: (1) the admission of M.Z.'s propensity evidence; (2) the admission of Bridget's testimony Gabriella reported having sex with Aldana within days of the incident under the fresh complaint doctrine, and as prior consistent statements; and (3) the exclusion of a rumor Gabriella told Bridget, who told an unidentified female high school student, that she had been dating and having sex with a Long Beach State University professor before the acts alleged against Aldana. We perceive no error in these rulings.

### 1. Propensity Evidence

#### a. Background

Aldana had sexual intercourse with M.Z. when she was 16 years old. The prosecutor argued Evidence Code section 1108 authorized the admission of Aldana's lewd acts with M.Z. during her minority to establish his "sexual appetite for young girls," and his pattern of targeting and pursuing young girls under his supervision.

11

Citing Evidence Code section 352, defense counsel asserted M.Z. and Aldana had been through "a contentious divorce, including infidelity on her part, getting caught cheating with a police officer, all of which would go to her motive, bias, interest in testifying, because there's that discrepancy in the age, because there's a discrepancy in the facts, that would cause essential litigation of their divorce . . . ."

Counsel also argued the incidents were too dissimilar for the evidence to be relevant, emphasizing that Aldana's relationship with M.Z. stemmed from a family connection, and not a teacher-student relationship. Plus, with M.Z., Aldana engaged in courtship and marriage.

The court admitted M.Z.'s testimony, but limited it to "when their relationship started, how old was she, and what relationship she had to [Aldana] before their relationship started. Was he her teacher, was he her brother's soccer coach. That's it. Nothing else about . . . what happened during the marriage or the various allegations which each spouse made against the other."

*b. Analysis*

Aldana argues the court abused its discretion by admitting M.Z.'s testimony as prior sexual misconduct evidence under Evidence Code section1108. We disagree.

Evidence Code section 1108 allows evidence of a defendant's uncharged sex misconduct to be admitted if the probative value of the evidence is not "substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274, citing Evid. Code, § 352.) A court must "consider such factors as its nature, relevance, and possible remoteness, . . . the likelihood of confusing, misleading, or distracting the jurors . . . , its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives . . . . [Citations.]" (*People v. Falsetta* (1999) 21 Cal.4th 903, 916-917.) In this case, Aldana

12

acted as 16-year-old M.Z.'s soccer coach, and 14-year-old Gabriella's teacher, when he had sex with both girls. Thus, he occupied a position of trust with both young girls. He used his position to lavish attention on the girls and justify the time he spent with them. With time and attention, Aldana eventually persuaded both girls to have sex with him by professing romantic love. Although the acts with M.Z. occurred 15 years before the charged crimes, and Aldana eventually married her, the court carefully considered the similarity, remoteness, and potential for confusion posed by M.Z.'s testimony, and properly limited the possible scope of M.Z.'s testimony to her early relationship with Aldana. The presentation of M.Z.'s testimony took little time, and there was a small risk for jury confusion. In other words, the court properly admitted M.Z.'s testimony under Evidence Code sections 1108 and 352.

2. *Fresh Complaint Doctrine & Prior Consistent Statements*

        *a. Background*

        The People moved to admit evidence Gabriella told Bridget, Houshyar, and Soto, about having sex with Aldana within hours and days of the incident under the fresh complaint doctrine. The People argued these statements were not being offered for the truth of the matter, but to provide "when and under what circumstances the complaints were made."

        Defense counsel did not object. In fact, she said, "for strategic reasons, I've decided not to object given the nature of the statements and how they came about over the period of time and all of [the] things of that nature. I have decided not to object."

        At trial, Bridget testified she saw one text between Aldana and Gabriella. Aldana asked Gabriella if she and Bridget had ever "hooked up." Bridget had also seen Gabriella alone with Aldana in his classroom the day Gabriella came to visit. Bridget testified they were standing very close together. When Aldana saw Bridget, he looked at her in a way that made her feel very uncomfortable.

13

When the questioning shifted to September 10 and 11, the prosecutor asked Bridget about Gabriella's "report to you, what did that include, what did she tell you?" Defense counsel objected on hearsay grounds. The court overruled the objection, but argument continued outside the presence of the jury.

Defense counsel argued the fresh complaint doctrine did not permit the prosecution to introduce evidence about "an entire relationship." The defense wanted to limit the prosecution to evidence Gabriella told Bridget she was afraid of getting pregnant because she had sex with Aldana. Defense counsel argued no other hearsay statements concerning the details of Aldana's acts with Gabriella should be admitted.

The court decided Gabriella's statement to Bridget about having sex with Aldana was admissible under the fresh complaint doctrine, and gave the following admonition to the jury: "All these complaints that Gabriella may or may not have made to Bridget are not to be used for the truth of the matter asserted. They are not to be used to show that these incidents happened, but to assist the jury in evaluating the credibility of Gabriella when she testified."

### b. Analysis

Under the fresh complaint doctrine, a trial court may admit evidence of an extrajudicial complaint made by a victim of a sexual offense for a nonhearsay purpose. (*People v. Brown* (1994) 8 Cal.4th 746, 749-750.) As our Supreme Court explained, "proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*Ibid*.) "The jury may consider the evidence 'for the purpose of corroborating the victim's testimony, but not to prove the occurrence of the crime. [Citation.]'" (*People v. Manning* (2008) 165 Cal.App.4th 870, 880.)

14

Aldana's argument about the scope of Bridget's testimony ignores one point. Bridget's testimony did not contain the details of Aldana's sexual assault. Bridget merely testified Gabriella said she and Aldana engaged in oral, anal, and vaginal intercourse. This testimony is much less detailed than testimony found to be acceptable in other cases. (See, e.g., *People v. Butler* (1967) 249 Cal.App.2d 799, 804 [victim stated that "'the man was sucking his thing'"]; *People v. Cordray* (1963) 221 Cal.App.2d 589, 594 [victim stated "he had pulled her pants down and he had kissed her between the legs"].) In our view, Bridget's testimony fell within the scope of the fresh complaint doctrine.

The court also ruled Gabriella's hearsay statements to Bridget were admissible as prior consistent statements. (Evid. Code, §§ 791, subd. (b), 1236.) Aldana argues the fact Bridget testified before Gabriella improperly enhanced Gabriella's credibility and deprived him of his constitutional rights, but we are not convinced.

Although Bridget was the People's first witness, the court has broad discretion to control the order of witnesses. (Pen. Code, § 1044 ["It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved"].)

The court determined Gabriella's probable testimony from the parties' offers of proof, and the defense argued during opening statement that Gabriella fabricated her story for financial gain. (Evid. Code, § 791, subd. (b) [prior consistent statement admissible when an express or implied charge of recent fabrication has been made].) When Gabriella did testify, her statements were consistent with the parties' representations. Thus, assuming the court misapplied the fresh complaint doctrine, Gabriella's hearsay statements to Bridget were admissible as prior consistent statements under Evidence Code sections 791, subdivision (b) and 1236.

15

*3. Prior Sexual Conduct Evidence*

The People moved to exclude, under Evidence Code section 782 and 352, evidence of a rumor Gabriella told Bridget, who told another female high school student, that she was having a sexual relationship with a male, Long Beach State University professor in his 30's before the acts alleged against defendant. According to the prosecutor, Bridget denied the incident occurred. The court granted the People's motion and prevented Aldana from questioning Gabriella about it at trial.

Aldana argues Evidence Code section 782 did not apply, and the court's ruling violates Evidence Code sections 210 and 352, and his right to a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments. We find any error harmless.

The Evidence Code generally bars questioning a sexual assault victim about specific instances of his or her prior sexual activity. (Evid. Code, § 1103, subd. (c)(1); *People v. Bautista* (2008) 163 Cal.App.4th 762, 781). But, the general rule gives way when evidence of the complaining witness's prior sexual history is "offered to attack the credibility of the complaining witness as provided in [Evidence Code] Section 782." (Evid. Code, § 1103, subd. (c)(5).)

However, Evidence Code section 782 requires the proponent of the evidence to file a written motion accompanied by an affidavit containing an offer of proof. (Evid. Code, § 782, subd. (a).) "If the trial court finds that the offer of proof is "sufficient," it must conduct a hearing out of the presence of the jury and allow the alleged victim to be questioned 'regarding the offer of proof . . . ." (*People v. Sims* (1976) 64 Cal.App.3d 544, 553 (*Sims*).)

Aldana did not file a motion to introduce evidence Gabriella claimed to have a sexual relationship with an older, male teacher before Aldana, nor did he submit an affidavit with an offer of proof. His failure to file a proper motion under Evidence Code section 782 arguably forfeited any complaint about the court's exclusion of this potential impeachment evidence. (*Sims*, *supra*, 64 Cal.App.3rd at p. 554.)

16

Furthermore, even if Evidence Code section 782 does not apply, Evidence Code section 352 permits the court to exclude otherwise relevant evidence if its probative value is substantially outweighed by the probability that admitting the evidence will unduly prolong the proceeding, prejudice the opposing party, confuse the issues, or mislead the jury. (*People v. Zepeda* (2008) 167 Cal.App.4th 25, 34-35.)

In this case, the court conducted the required Evidence Code section 352 analysis and excluded the disputed evidence of Gabriella's alleged prior sexual relationship, primarily because Bridget denied the incident occurred. The court concluded litigating the issue would necessitate the undue consumption of time, and also posed a great risk of confusing the issues and misleading the jury. In our view, the court acted well within its discretion under Evidence Code section 352

Moreover, any error in the exclusion of this potential impeachment evidence was harmless under any standard of review in light of the overwhelming evidence of Aldana's guilt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.) When confronted with Gabriella's allegations, Aldana not only denied having sex with her, he also denied texting or calling her. However, the parties' phone records showed numerous contacts between the two during the relevant time period. In addition, Gabriella accurately described a surfboard in Aldana's home, items in his bedroom, and a sun tattoo on his shoulder he normally covered with clothing, and she made contemporaneous reports of having sex with him to her friends. In sum, any error in excluding Bridget's testimony about the rumor to impeach Gabriella would not have resulted in a more favorable verdict for Aldana. (*People v. Cudjo* (1993) 6 Cal.4th 585, 612.)

## DISPOSITION

The judgment is affirmed.


THOMPSON, J.

WE CONCUR:


MOORE, ACTING P. J.


ARONSON, J.